CARROLL *vs.* NORTON.

*In the matter of proving the last Will and Testament of*
JOHN L. NORTON, *deceased.*

ALTHOUGH there are more than two witnesses to a will, yet a compliance with the forms prescribed by the statute, in the presence of two, is all our law requires, notwithstanding a third witness attested.

A will admitted to probate,—where the testator was very aged, and the powers of his mind somewhat impaired, but there were no traces of fraud, the will was holographic and its provisions were consonant with the state of his affections.

The exertion of influence to the extent of destroying free agency will never be presumed merely from opportunity and interest, when there are *indicia* of volition, spontaneousness, and consonance of the testamentary provisions with the state of the affections.

To detract from the force of instructions, there must be some ground for inferring control or influence, or an effort to produce the instructions, or some cognizance of the testamentary act, or some trace of fraud, complicity or clandestinity.

H. BREWSTER, *for Executor.*

I. The will was duly executed, as appears by the testimony of the subscribing witnesses. It was subscribed, published, and witnessed at the request of the testator. The only point therefore is, was it signed in the presence of the witnesses or acknowledged by him to have been so made to each of the attesting witnesses. We do not contend it was signed in presence of each, but we say it was acknowledged to them, and thus the second act mentioned in the statute was duly performed.

The object of the statute is to guard against fraud. *Lewis* vs. *Lewis*, 1 *Kern.*, 220. In that case there was a clear want of evidence. *Rutherford* vs. *Rutherford*, 1 *Denio*, 33, was the case of a man sick unto death, and his wife, the devisee and legatee, spoke for him. There was an entire defect of proof in that case.

In *Brinkerhoof* vs. *Remsen*, 8 *Paige*, 488, it distinctly appeared there was no publication, (*see p.* 498, *near the foot. S. C.* 26 *Wen.*, 332.) No form of words is necessary. There the will was written by the daughter—an executrix. *Chaffee* vs. *Baptist*, *Miss. Con.*, 10, *Paige*, 85. The will in that case was not signed by the testatrix, and she said nothing of the signature, which had been made for her. It is not necessary all the witnesses should recollect all the facts. *Nelson* vs. *McGiffert*, 3 *Barb. Ch. R.*, 162. In this last case the Chancellor says, p. 163, " The statute does not require any particular form of words to be used by the testator, either in the admission of his signature," &c. *Jauncey* vs. *Thorne*, 2 *Barb.*, *Ch.*, 41. That case was argued by the ablest counsel in the State, and was decided by our experienced Chancellor after a full examination of all the adjudged

cases, and though the statute was differently worded, yet, as to the principle above referred to, it is in point. At page 59 the Chancellor says, " I do not deem it necessary that the testator should in terms declare that his name signed to the will, was so signed by him. But the production of the will with his name subscribed to it, and in such a way that the signature could be seen by the attesting witnesses, and the request of the testator that they should witness the execution of the instrument by him, or as his will, would, of itself, be a sufficient acknowledgment of his signature to render the will valid." This is the spirit of the English cases, under 1 *Vic. Ch.*, 26, which is similar to our present statute, except that by the English statute, a publication in presence of witnesses is not required.

II. Was the deceased competent to make a will, or in other words, was he of disposing mind and memory?

The rule of law on this point is, that any one not an idiot, lunatic, or *non compos mentis*, may make a will, be his understanding ever so weak.

*Non compos mentis* is defined by Lord Coke as of four kinds. 1. Idiota. 2. He that by sickness, grief, or other accident wholly loses his memory and understanding. 3. Lunatics. 4. He that is drunken, &c. (*Blanchard* vs. *Nestle*, 3 *Denio*, 37, 41.) The only division of *non compos mentis* to be considered here is this—had the decedent wholly lost his memory and understanding. (*Stewart's Executors* vs. *Lispenard*, 26 *Wendell*. See authorities cited at pages 299–301.) The term *non compos*, of unsound mind, means a total deprivation of sense. A total deprivation of sense cannot exist when a man can travel alone from New York to Rockaway and back, change conveyances, judge of the relative propriety of selling property in the lump or in lots, get up maps for the sale, buy coats and blankets and pay for them, count money, and look to his affairs.

III. There is no evidence of undue influence, or in fact of

any attempt to exercise any influence whatever.   There is no witness who speaks of the declarations of the deceased as to what disposition he would make of his property, except Ann Lew.   No other witness swears like her.   She says she never heard Mr. Norton talk sensibly—that he did not like to stay with Carroll, and complained of him.   If this was true, why did he stay there?   This is wholly contradicted by the urgency of the old gentleman to get him in the Custom House. It is inconsistent with his laudations of his worth and bravery, with his affection, and his declarations that he intended to make his house his home while he lived, and in fact with the whole case and all the other evidence.   There is not one of the cases where undue influence has been held to avoid a will, where the circumstances are at all like this.   They are cases where the deceased was confined to the house, and dependent upon those around him for physical aid, and generally was bed-ridden.   As to the cases in Curteis referred to, in one of them, the sole legatee had prepared a draft or form of the will and had no doubt fixed it up to suit himself.   He was the solicitor of the deceased and bore no other relation.   The other was a case where strangers, an innkeeper and a lawyer, shared.   (*Panton* vs. *Williams*, 2 *Curteis*, 530.)   The wills and codicils were in the handwriting of the executor and chief legatee.   *Mowry* vs. *Silber*, in this court, is the case chiefly relied on by the counsel.   I confess that is the strongest case, and contains the strongest expression as to the *onus probandi* of any I have seen.   But there your honor dwelt upon the fact that Mowry, the son-in-law, called the lawyer, and was present at the instructions and execution.   The old man was near death, and repeated, parrot-like, his instructions to the lawyer who wrote the will.   It is put upon the ground *not* of *persuasion*, but that it does not really express the will of the deceased— but the will of another.

That John L. Norton knew the contents of the will, if he knew any thing, is evident, because he wrote it all himself. Norton was of much superior mind and intellect to Silber, and rather obstinate or wilful.   His affections were strong, but

he was not easily persuaded. He travelled about, and stayed and went where he pleased. He did not live with Carroll at the time the will was made. There is no evidence that Carroll had ever spoken to him on the subject. He was not present at its execution, nor is there anything to show he knew of the intention to make a will.

Wm. Watson, *for Contestant J. L. Norton.*

I. The paper offered for probate is not proved according to law. The statute now in force requires that the "subscription shall be made by the testator *in the presence of the attesting witnesses,* and also that he declare it to be his last will." *Both* acts must be performed; one cannot be inferred from the other. (*Lewis* vs. *Lewis,* 13 *Barb.,* 25.)

(*a.*) These formalities were not required at the time of the will of Jauncey, cited by the executor's counsel.

(*b.*) Sarah Axford says that she gave her whole attention at the time, and that no execution was proved or acknowledged except publication. The father says it was not executed in his presence. He should have liked it better if it had been. He thinks execution was acknowledged. The son says he thinks the testator said, " that is my name." At all events, Sarah Axford was an attesting witness, and execution was not acknowledged to her, though the act requires it shall be, if not signed in their presence, acknowledged to each of the attesting witnesses.

(*c.*) There is no attestation clause. As facts stated in an attestation clause supply imperfect proof, (2 *Bradford,* 73,) so the entire absence of any attestation clause raises an inference against such proof.

(*d.*) It is important that a strict compliance with statute formalities be required. Had counsel been present to attend to formalities, it would have been equally his duty in a case like this to have directed the infirm testator to the claims of others, brought them to the testator's memory, and seen that no imposition was practised either through influence or in

any other way, and acquainted him that the ground on which he made the will, viz., that others had enough, was a mistake. (1 *Jarman*, 30.)

II. John L. Norton, at the date of this will, was not of sound and disposing mind and memory.

(*a*.) In addition to facts, circumstances, and letters, nineteen witnesses depose to incapacity. They establish great loss of memory in the deceased—that a few days prior to the date of the will during a ride to Rockaway, he stopped at every baker's shop in Brooklyn for bread, forgetting he had bought some a moment since. He forgot an old friend, Van Nostrand, before reaching the court house, though told who he was on setting out; and could not be made to remember his grand-daughter. He was insensible to the proprieties of life, as shewn at table and in Rider's store. Pearsall refused to paper the house as he requested, and Stewart, the lawyer, to address him on business, from incapacity that was apparent. Morrison notifies him to withdraw his account from the bank and admonishes his friends he is too old to be suffered to endorse. These witnesses depose to facts, saw him as he was, and for the most part are in the same station of life as the witnesses to the will. On the other hand, the alleged executor, besides the subscribing witnesses, calls but eight. One of them, Mr. Beardsley, says that the deceased had failed much in five years, was childish, and doted on Carroll, using a phrase which is incompatible with the exercise of sense and judgment in a testamentary disposition. The medical witness, Hyslop, states that he had no sufficient conversation to judge of his mind. Counsel who did his business were not called, but counsel who did not. His faculties, whatever they were, were more likely to be aroused in the presence of counsel like those called, than in that of such witnesses as attested the will. His daughter, the mother of Carroll, was not called, though having an advancement equal to her share she had no interest. The evidence, for the most

part, is negative, what they did not see, rather than what they did, is unsupported by facts, and made up mainly of opinions. It is insufficient to affect the weight of evidence offered by the contestant.

(*b.*) But evidence superior to the opinions of witnesses is found in the acts of the testator himself. For five years prior to his death, he was but an instrument in the hands of others. A large portion of his estate he lost by endorsing for his counsel; at the request of another, he states under the solemnity of an oath, that his wife " when quiet was competent to convey,"—" she knew what she did when she promised to sign," and when that influence was removed, he writes, in the most unmistakable words, that she was " mentally and morally incapable to convey." He makes an absolute and unconditional delivery of the quit claim deed of his son to Mr. Clarke, and then writes to the son that his deed was delivered in *escrow*, not to be used without his permission. If he through influence knew not what he did when under oath, the inference is strong that in the less solemn act of testamentary disposition he knew not what he did, and was incompetent to make one.

(*c.*) He did not know the amount of his property, but was receiving alms from Beardsley and Clark, and representing himself as destitute, when he had, at least, a clear estate of $10,000.

(*d.*) The true rule as to capacity is as laid down in *Clarke* vs. *Fisher*, affirmed 2 *Comstock*, 498, and *Derr* vs. *Johnson*, and the *Marquis of Winchester's* case, viz., " capacity to dispose of property with sense and judgment, in reference to the situation and amount of such property, and the relative claims of the different persons who were the objects of the testator's bounty,"—a rule from which there has been no departure by any enlightened court, except the case of *Lispenard* vs. *Stewart*, and that was well declared by Oakley J., in his charge to the jury in the suits of ejectment between the same parties, to be rather the finding of a fact in that particular case than the exposition of any principle of law.

III. The will is unequal, unreasonable, and unnatural. (*Patterson* vs. *Patterson*, 6 *Serg. & Rawl*, 56; *Clarke* vs. *Fisher*, 1 *Paige*, 171.)

(*a.*) The deceased had three living children; John, his eldest son, to whom he was indebted for the greatest favor, and expressed his warmest gratitude, with whom he never had a difference, whom he was in the habit of visiting, and writing for money after the making of the will: a daughter, the mother of Carroll; a son Samuel; six children of a deceased daughter, two of whom so far from having enough, as the deceased had been led by some one to suppose, were females unmarried, without property, and supported at one time, according to Travis, by the deceased; and other grandchildren, Ludlow and Norton Carroll, not heirs-at-law, but brothers of this legatee, in circumstances of destitution. No mention is made in the will of any of these, but the will is made in secret and without their knowledge, giving his entire estate to one grandson. In *Weir* vs. *Fitzgerald*, it was noted by the court in these words, "None of the testator's kin appear to have been forgotten." (2 *Bradford*, 65.) In this case none were remembered.

IV. But, even were the will formally proved, this is one of those cases in which formal execution is not sufficient. The proof of the proponent does not go far enough. He should come into court prepared, not only with a formal execution, but to show,

(*a.*) That the others had enough—that the ground on which the will was made was a fact, and not a delusion of the mind, (like the "*escrow*" and the capacity of his wife,) created by one person—there could be no other—the sole legatee;

(*b.*) That the deceased was aware of the value of his estate and was reminded at the execution, of his blind son and his claims, and what he had done to extort a parent's gratitude;

(*c.*) That he was reminded of the two females he supported in life—of Ludlow and Norton Carroll, who are entirely without property—whereas, it appears by Axford's evidence, he

was not aware the testator had a son, and Axford was the only counsel to advise him. (*Mowry* vs. *Silber*, 2 *Brad.*, 151, 152; *Weir* vs. *Fitzgerald*, *Ib.*, 69; 1 *Jarman on Wills*, 30.)

V. This sole legatee stood toward the decedent in a relation of trust and confidence. He was his assignee. This relation imposed an additional obligation on the proponent to come prepared with proof beyond a formal execution. (*Harwood* vs. *Baker*, 3 *Moore P. C.*, 290; *Huguenin* vs. *Baseley*, 14 *Ves.*, 273; *Ingram* vs. *Wyatt*, 1 *Hagg.*, 401, 428, 355; *Earl of Portsmouth's case*, 1 *Hagg.*, 366; *Gibson* vs. *Jeyes*, 6 *Ves.* 266; *Billinghurst* vs. *Vickers*, 1 *Phillimore*, 187, 192, 200; *Hylton* vs. *Hylton*, 2 *Ves.*, *Sr.* 547; *Hatch* vs. *Hatch*, 9 *Ves.*, 292; *Bridgeman* vs. *Green*, *Wilmot*, 70; *Griffith* vs. *Robins*, 3 *Madd.*, 191.)

(*a.*) It appears that in 1851 the deceased made Brockholst L. Carroll his assignee. It does not appear that either at this time, or at any previous period of his life, when in the possession of unimpaired faculties, he made any will or declared any intention of excluding his children and heirs from all share in his estate, and giving it entirely to a grandson. This act was reserved for the last year of his life, when in the language of proponent's witness, Mr. Beardsley, the decedent was childish and doted.

VI. It is alleged in the proponent's third point, that there is no proof of undue influence or of any influence whatever. To which I answer. It appears, that for a number of years prior to his death, the decedent had been such a subject for undue influence that he was the unresisting instrument with which those who stood in relations of trust and confidence were enabled to strip him of his estate, even while he lived —that he lost large sums by accommodation endorsements for one of his counsel—that he was much under the influence of his attorney,—that his large property had dwindled away—that as long ago as 1851, he was induced by the influence over him of a counsellor at law to make state-

ments, under oath, on which an important suit was made to turn, which, when that influence was withdrawn, he declares in writing, were sheer fabrications—that he doted on the legatee—a state of mind in so aged and infirm a person as to be, when taken in connection with his ready yielding to influence, wholly incompatible with any testamentary disposition, other than the legatee should dictate,—and that the letter of the deceased, in which he says, " Brock is well, and very happy, especially to see grandpa, he hangs around me, and stops as he goes up the Bowery, and casts many a longing lingering look behind," shows that improper artifice was used by proponent toward him. (*Mountain* vs. *Bennett*, 1 *Cox, Ch. Ca.*, 355.)

(*a.*) In *Billinghurst* vs. *Vickers*, the residuary clause was not admitted to probate, although a previous bequest was declared duly proven. (1 *Phillimore*, 187, 192, 200.)

VII. The fact of the testator writing the will, like instructions in a case where undue influence is charged, proves nothing; for the same power which produces one produces the other. (*Wilmot*, 70; 2 *Bradford, R.*, 149.)

H. D. SEDGWICK, *for Contestant, S. R. B. Norton.*

I. There is no sufficient proof that the will was duly executed.

1. The *onus probandi* is imposed wholly on the proponents, (*Barry* vs. *Butlin*, 1 *Curt.* 637; *Baker* vs. *Batt*, 2 *E. F. Moore*, 317; *Paske* vs. *Ollatt*, 2 *Phil.* 323.) The will was manifestly drawn, and was proved to have been executed without the aid of competent counsel: the absence of an attestation clause therefore, together with the short period intervening between the time of the alleged execution, and that when the witnesses testified, precludes all presumption in favor of the execution. To authorize any such presumption, the circumstances must not only admit of it, but must favor it, otherwise the execution must be strictly proved.

This will be seen from all the cases, where presumptions have been permitted to supply the proof of facts, not remembered by the subscribing witnesses. (*See Wilson* vs. *Hetterick*, 2 *Brad.*, 427.)

2. There is no such proof. No witness swears positively that the will was signed when produced by the testator, or that the signature was acknowledged by him. The expression of the witnesses' belief that there was a recognition of the signature is not evidence. (*Butler* vs. *Benson*, 1 *Barb. S. C. R.* 537; *Wilson* vs. *Hetterick, cited supra.*) If it were evidence, it would be deprived of weight from the following circumstances, viz. : the discrepancy in the testimony of the witnesses as to the language of the testator; their vague and inconsistent recollection of what occurred in relation to the alleged acknowledgment; the disagreement in their evidence both as to the hour and the date of the transaction; the fact that they were ignorant of the ceremonies required by the law, as appears from Mr. Axford's giving a reluctant consent that his daughter should sign, only because he supposed on the information of the testator that three witnesses were necessary, and also from their not writing their places of residence opposite their signatures; and together with these, the fact, also evident from the last mentioned circumstances, that the testator himself, if he had any law whatever in his mind at the time in regard to the necessary forms, had that which existed prior to the Revised Statutes, and under which he had executed a former will; and the necessary conclusion that he could not have been aware that an acknowledgment of the signature was required. These facts establish conclusively the presumption that there was no acknowledgment by the testator of his signature, as an act independent of the several other acts required by the statute in the execution of a valid will.

3. As above stated, the will is not proved to have been signed when produced before the witnesses by the testator. But assuming it to have been signed—a mere constructive acknowledgment of the signature is wholly insufficient within

our statute. (2 *R. S.* 63, § 33.) There must be a distinct, independent acknowledgment of the signature in terms; an act by itself; and such acknowledgment cannot be inferred from the mere production of the will, the conduct, bearing, or gestures of the testator, or from a compliance however complete, with the several other formalities specified in the statute. It is true, that in some of the English cases, the lax rule existing in regard to these acknowledgments prior to the present statute of wills (1 *Vic. ch.* 26,) has been since retained without due consideration of the change enacted by that statute. But these cases for various reasons, are not authority for us. They are inconsistent with other English cases. ( *Vide Hudson* vs. *Parker.* 1 *Rob. Ecc. R.*, 14. *In the goods of Ann Rawlins,* 2 *Curt.,* 326. *Ib. Mary Harrison,* 5 *Jur.,* 1017.) They are deplored by English writers of authority as leading to a practical repeal of the statute by judicial construction. (7 *Jurist, part* 2, *p.* 313. 6 *Jurist, part* 2, *p.* 34.) They are too extraordinary to be sustained by principle (*e. g.*) where publication and acknowledgment of a will are wholly inferred from gestures. (*In the goods of Davis,* 2 *Rob. E. R.* 837.) So too in the various cases as to the constructive presence of the witnesses, which is determined by *the position of the testator in bed.* They have the direct sanction of no American authority. (The case of *Jauncey* vs. *Thorne,* 2 *Barb., Ch.* 40, which appears to sanction the English rule, was founded on the law which existed prior to the Revised Statutes, and which was destitute of our provision in both its branches.) To settle the question, they are expressly repudiated and overruled in this State. (*Lewis* vs. *Lewis,* 13 *Barb., S. C. R.* 17, 24. *Affirmed,* 1 *Kern.,* 220.) The other cases in point in this State, are in consonance with that last cited. (*Rutherford* vs. *Rutherford,* 1 *Denio,* 33; *Chaffee* vs. *Bapt. Convention,* 10 *Paige,* 85; *Remsen* vs. *Brinckerhoof,* 8 *Paige,* 491; *and* 26 *Wend.,* 331. *Heyer* vs. *Burger,* 1 *Hoff. Ch. Rep.* 20. *Butler* vs. *Benson,* 1 *Barb. S. C.,* 526. *Scribner* vs. *Crane,* 2 *Paige,* 148. *Burritt* vs. *Silliman,* 16 *Barb.* 198.)

CARROLL *vs.* NORTON.

II. The testator was not at the time of the execution of the will possessed of testamentary capacity, within the meaning of the statutes of this State.

1. His memory was not sound. The standard of capacity *is created by* the statute, which has not been construed in this State with direct reference to the question of memory. (2 *R. S.* 60, § 21.) So far as a precise rule can be gathered from judicial decisions in this State, the testator was utterly deficient in memory. (*Clark* vs. *Fisher*, 1 *Paige*, 174.) The English rule is the same. (*Combe's case, Moore*, 759 ; *Marquis of Winchester's case*, 6 *Rep.* 23 ; *Herbert* vs. *Lowns*, 1 *Ch. Rep.* 13. *Shelf*, 361, 363.) It is impossible without rejecting the largest portion of the evidence in the case, to hold that the testator had " a sound and disposing mind and memory, so as to be capable of disposing of his property with sense and judgment in reference to the situation and amount of such property, and the relative claims of the different persons who were the objects of his bounty."

2. Nor was the testator of *sound mind*, within the meaning of the statute. His language and acts at the period of the supposed execution of the will indicate derangement, not mere imbecility. His mind was at that time completely unhinged. The language of the will, the demeanor of the old man, the wreck of his fortunes, the impossibility felt by business men of continuing dealings with him, all corroborate the view offered by the direct evidence for the contestants. See as to this branch of the case the following authorities : (*Harwood* vs. *Baker*, 3 *Moore, P. C.* 290 ; *Marsh* vs. *Tyrrel*, 2 *Hagg.*, 84 ; *Shelf*, 363 ; *Mountain* vs. *Bennett*, 1 *Cox*, 353– 357 ; 1 *Jarman on Wills*, 29 ; *Goldie* vs. *Murray*, 6 *Jurist*, 608.) Also the cases cited under first subdivision of this point.

3. Most of the witnesses for the proponent formed their opinions while the mind of the testator was in comparative vigor. Their late intercourse with him, conducted chiefly in writing, had not been in general of a nature to remove these impressions. Their testimony also, however faithfully intended, was generally too deficient in *circumstantiality* to entitle

it to prevail over that of the contestants.   The right of the heir is antecedent to that of the devisee, and in a doubtful case must prevail.   (*Swinb.*, *Part* 2, § 3.)

III.  In the condition of the testator's mind, and under the circumstances of the case, the legatee was bound to have affirmatively exonerated himself by further and complete proof, from the legal presumption of undue influence.   The testator was fatally liable to influence.   He was nearly ruined by endorsements for another, in defiance of the entreaties of his friends.   His integrity was unquestioned.   Yet in the suit of *Cooke* vs. *Norton*, he was induced to testify regarding his wife's incapacity, contrary to his convictions, as shown by subsequent letters.   Such facts outweigh the speculations of the witnesses for the proponent.   Notwithstanding the affection felt by Mr. Norton for his grand-children, including Brockholst, the evidence shows no intention to deprive his children of their rights as heirs-at-law, but the contrary—(*See* testimony of S. Norton, jr., Ann Lew, and correspondence.) Mr. Brockholst Carroll was the general assignee of the testator, thereby sustaining towards him a fiduciary relation.   He was residing with, or constantly visiting the old man, at the time when the will was made, and thereafter until his death.   He was probably present when the will was drawn.   It is apparent from abundant evidence that he had the power to control its provisions.   It is for him to show that he did not exercise this power.   (*Mowry* vs. *Silber*, 2 *Bradf.* 147, 149, 151, 152; *Moore* vs. *Moore*, 2 *Bradf.* 261 ; *Weir* vs. *Fitzgerald*, 2 *Bradf.* 42 ; *Durling* vs. *Loveland*, 2 *Curt.* 225 ; *Panton* vs. *Williams*, 2 *Curt.*, 530 ; *Sankey* vs. *Lilley*, 1 *Curt.*, 397 ; *Greville* vs. *Tyler*, 3 *E. F. Moore*, 320.),

IV.  Probate of the will should be denied.


The Surrogate.—The first objections interposed against the probate of the will of the deceased, relate to the forms of execu-

tion. The transaction took place at the store of John Axford, No. 168 Bowery. The will is dated March 11, 1854. Axford testifies that the decedent came in with the will in his hand, and stated that he wished him, his son and daughter, to be witnesses to his last will and testament. He says, "I took the paper from his hand and read it all through. I think his name was already signed to it: when I took it, I asked him if that was his last will and testament, and he declared it was. I then signed it in his presence. It strikes me I asked him if he signed it, and he told me he did. I think my son and daughter were present all this time. They may possibly have been called one side in the store, and not heard all Mr. Norton said. I signed it and handed it to my son, who was standing by my side at the time, and he signed it— then my daughter signed it, Mr. Norton saying it required three." On cross-examination Mr. Axford stated, that he thought he did not see Mr. Norton sign the will, but asked him "if that was his signature, and he replied that it was." Mr. Axford's son testifies that the decedent asked them to witness the will, and said, "that's my name." Mr. Axford's daughter does not remember whether the will was signed by the decedent when she witnessed it, or that she heard him acknowledge his signature. This is about the substance of the evidence on the point of acknowledgment of the signature; and I am satisfied by it, that as a matter of fact, the paper was already subscribed by the decedent when he came into the store, and that he acknowledged the signature to two if not all three of the subscribing witnesses. Such being my view as to the fact on that point, and the proof being clear as to the other statutory requisites, I think the formal execution satisfactorily established. There may be more than two witnesses, yet if the acknowledgment be made to two, it is enough, so far as our law is concerned. The testator having some claim against parties residing in the State of Rhode Island, it is not unreasonable to suppose that in requiring the attestation of three witnesses, he had regard to the laws of that State. In any event, I have no hesitation in ruling that

a compliance with the forms in the presence of two witnesses is all our law requires, even if a third witness attested.

The probate is resisted, however, on the grounds of want of testamentary capacity, and of undue influence. Mr. Norton was an old gentleman once in affluent circumstances, but retaining in his advanced age only the wreck of a handsome fortune. It does not clearly appear how he had become so much reduced, though there is evidence to show that towards the close of his life he had suffered heavily by endorsements, and there is likewise proof that he had been liberal towards some members of his family.

In judging of the state of his mind, due allowance should be made for the difficulty in conversing with him consequent upon his loss of hearing, which latterly was almost total, so that it was necessary to communicate with him by writing. At the time the will was executed, he was over eighty years of age. He was not, however, so infirm as to be confined to the house, but was of active habits, and continued to go about the streets until the fatal accident which terminated his life. On the evening of the 22d of November last, he was run over by one of the Third Avenue Railroad cars at the corner of Forty-second street, and was taken to Bellevue Hospital, where he died. It was found by the Coroner's jury that he was deranged, but on examining the testimony, I see no ground for such a conclusion. That after the occurrence of the accident he should have talked wildly, was quite consistent with entire sanity before, and that he did not hear the outcry of the driver of the car is readily explained by the state of his hearing. The ramblings or mutterings of a man in the agonies of death, or on the first shock of such a dreadful accident, weigh as nothing in the estimate of his intellectual vigor when in health. I proceed now to examine, in some detail, the evidence adduced to impeach his capacity, which is entitled to more serious consideration.

Mr. Wall rode with Mr. Norton from Brooklyn to Rockaway, about the first of March, 1854, and thought " there was something or other wrong with his mind at that time." He

"took him to be flighty ; that he did not exactly understand himself." The reasons for this opinion were, that soon after starting, the deceased wished his son, John, to stop, that he might buy a fresh loaf of bread. This was done, the bread bought and placed in a basket, and he made the same request again and again, until they had got quite out of the city. During the course of the ride, Mr. Norton missed his handkerchief, and on a suggestion that it might be in the basket, he opened the lid, took out an old newspaper, crumpled it up, and put it in his pocket. This witness expressed the opinion that the decedent was "wild" in his motions, and he also specified an occasion, when making a call at his house, he said he wanted to go home to dinner, though as stated by his son, he had just risen from the table before leaving home.

Dr. Webb, who had known Mr. Norton many years, expressed an opinion unfavorable to the soundness of his intellect. He says : "He has appeared to me for a number of years past to be a man of very varying and vacillating habits and manners. To go into the detail of all the facts would be impossible. I came to the opinion that Mr. Norton was not in a sound state of mind. I did not consider him competent to attend to business judiciously. He might do business in his particular way—not prudently or discreetly, probably." He rests this opinion upon his vacillation, rapidity of movement, restlessness, incoherence, or wandering from one subject to another in conversation. The only special facts he mentions was his renouncing a contract for the purchase of a farm at Hempstead, and that after taking a seat in his carriage one Sunday to ride to the cars, upon proceeding three miles, he left the vehicle somewhere near the Episcopal Church.

The Rev. Mr. King met the decedent in the Long Island railroad cars in September, 1852. He attracted his attention by his "fidgetty, restless conduct," and having stepped to the front platform as the cars were starting, he lost his balance and fell against the front railing. The witness caught him, drew him in the car, and directed him to a seat. On another

occasion, at the Jamaica depot, as the train was starting, Mr. Norton followed it some distance bareheaded.

Julia Spence, who lived with her aunt at No. 250 Bowery, states that from May, 1853, to some time in March, 1854, Mr. Norton boarded there occasionally for periods of several days or weeks. She says he was forgetful, would leave his coat up-stairs and look for it down-stairs, left his trunk at a hotel and forgot where he had left it, and lost his over-coat in a similar manner. He was childish; used to cry a good deal about his grandson Carroll; acted queerly, walking around and appearing to be looking for something. Roswell D. King, who boarded at No. 250 Bowery, from October, 1853, to January, 1854, observed the decedent crying over a letter he received from his grandson in Australia; he said he was starving. The witness mentions some trifling circumstances evincing forgetfulness, or absence of mind.

Mr. Craft, who married a grand-daughter of the decedent, testifies, that some months before his decease, the decedent met him in company with his wife in the street, and when accosted, said he did not know them. "He could not," he says, "find out in a great while who we were;" from which I infer that Mr. Norton did eventually recognize them.

Mr. Armitage states that the decedent did not remember sales of land he had made for him in 1837. He says that Mr. Norton often passed him in the street without speaking, and yet it appears he was always recognized when he addressed the decedent, and especially on one occasion, after a lapse of ten years or more in their acquaintance.

Mr. Nostrand testifies, that latterly the decedent failed to recognize him when they met, and several times, during a single interview at Hempstead, forgot who the witness was. He saw the decedent once or twice shouting and chasing after the stage at Rockaway. Mr. Rider says, that in conversation the decedent repeated the same incident frequently, in the space of ten or fifteen minutes. Some two years ago, Mr. Norton purchased a pair of pantaloons of him, and was about to try them on in the open store; thinks he had drawers

CARROLL vs. NORTON.

on. From six to twelve months before his decease, he saw him at the house of his son, John, and the old gentleman "spoke of his getting very deaf, and of his failing. He pointed to an old apple-tree, whose boughs and branches were all broken off, stating that was the case with him ; he was like that tree."

Mr. Pearsall, the keeper of an eating-house, says, that Mr. Norton once left his house without paying for what he had eaten, and at another time called for several dishes successively, without being satisfied with any. Mr. Abrams testified that the decedent left a box with him to have a key fitted, and forgot it.

Mr. Morrison, the cashier of the Manhattan Bank, proved that Mr. Norton's account with that institution was closed two or three years ago, in consequence of his checks coming in when there were no funds to meet them. He says : " He put it on the ground that he had made a mistake, or that he had drawn meaning to make it good. When spoken to on the subject, he seemed to know as to the amounts ; had a good memory." His irregularities probably grew out of embarrassments occasioned by accommodation endorsements to a very considerable amount. He recognized Mr. Morrison when they met face to face in the street. The witness would not have called in question any act of his when he had dealings with the bank, in respect to his mental capacity, but considered him incapable of doing business with the bank promptly and regularly.

Mr. Pine testifies, that the decedent forgot to pay him for some blankets, until reminded of the purchase a few days after, and that he several times mistook the store-door of No. 250 Bowery for the hall-door. Mr. James Rider states, that the decedent informed him he had paid ten thousand dollars for accommodation endorsements. He says : " I think in a transaction of importance, if I had been going to transact business with him, I would rather he had a friend with him." The witness expresses the opinion, that Mr. Norton, of late, had become quite childish, but he did not recollect " any

circumstance showing want of memory," and thought that in his conversation " he generally spoke with intelligence."

Mr. Noe says he considered the decedent imbecile, because he once told him how pleasant a death drowning was ; " that he had been drowned, and it was a very agreeable and pleasant sensation, and how easy it was to die." This witness also said, that his mind " wandered," by which, as he explained, he meant that he would commence talking upon one subject, and would then pass to another.

Jesse Crafts says, that the decedent did not recognize him, unless he went up, took his hand, and spoke to him. " He would seem to talk quite well when you could get him to understand ; but it was hard talking to him on account of his deafness."

Mr. Stewart was on terms of intimacy with the decedent. He spent an hour or two in conversation with him in July, 1854, at Jamaica, and considered him imbecile and childish, " because he would occasionally burst out into tears and cry, when speaking of old matters and his present situation, having formerly been possessed of a large property, and now being down in the world." He had forgotten he had been co-assignee with Mr. Stewart's father, in 1821, but he had taken no active part in the assignment. He recollected the assignor, and related several anecdotes about him. On proceeding to Rockaway in the stage, Mr. Norton did not observe that he had passed his son's house some distance, until reminded of it.

Mr. Pearsall, toll-gate-keeper at Rockaway, saw the decedent chase after the stage a number of times. Sometimes it would be stopped, and he get in. He says, his mind failed, he grew excitable. " His conversation would be rational," but he was changeable and passionate. He wished the witness to put an old worn out wire fence along the beach, and also to paper a room with paper of divers colors and patterns.

Mary McCredon, a domestic in the house of John L. Norton, Jr., thought the decedent childish, because he cooked clams on the kitchen stove, poured some slops into the tea-

pot, and put cakes back upon the plate. Ann Lew, a domestic in the same family, says the decedent handled the food at the kitchen table, poured slops into the tea-pot at the family table, and on one occasion forgot that it was Sunday.

This is about the substance of the testimony against the capacity of the decedent, and I think many of the circumstances not only trifling, but quite impertinent to a question touching his mental condition. The life of this gentleman appears to have been very thoroughly explored, and instances of every trivial mishap of the memory carefully exposed,— many of them, however, of no graver character than occur in the experience of any one. It is obvious, also, that some of the witnesses, in expressing an opinion that Mr. Norton was childish, imbecile, or of unsound mind, built very large conclusions upon very small premises. Take, for example, the idea thrown out by several, that he " wandered," because he passed rapidly from subject to subject. Here was an old man of active mind, once noted for his intelligence and acquirements, with one of the avenues to an intercourse with his fellow-men almost sealed, and yet with his tongue still loosened, and his powers of mind not all departed—what more natural, when he generally had the conversation nearly all to himself, than to pass from topic to topic, in the absence of any response to fix the subject and continue its discussion. The loss of hearing, also, by isolating the sufferer, and cutting off the ordinary means of communication, renders it more difficult to judge of the extent of his intellectual powers, without careful attention ; it detracts from his apparent intelligence, and withal becomes the source of frequent errors and misunderstandings. We should not judge the victim of such a calamity by ordinary rules, but rather be led to look into his case with a more critical eye, and a more charitable spirit.

There is no doubt that Mr. Norton's increasing age had of late borne heavily upon him, and that his powers of body and mind had begun to decay. But the state either of the body or of the mind is not always and invariably the same ;

the functional action is frequently fluctuating, and is dependent to a degree upon the exciting causes which arouse it. Shut off to a certain extent by the loss of his hearing from external communication, habits of attention would diminish, and habits of abstraction increase. Coupling this with the usual indifference of senility to recent impressions, we should look for an inactive memory on topics of minor importance. But even in view of the facts stated by the witnesses adduced to impeach his capacity, it is apparent that no total decay of memory is established. He occasionally failed to recollect trivial facts, but in essentials his power of remembrance seems to have been good. He knew his children and his grand-children, and generally recognized his acquaintances. But one solitary instance is alleged of his failure to recognize his relations, and that occurred in one of our thoroughfares, where, for the moment, a deaf old man suddenly addressed might be confused, without impeachment of his general mental soundness. As for his failure to recognize acquaintances, occasionally and casually met, it does not seem to have been uniform, and I think that, generally speaking, when his attention was fairly aroused, the occurrence was exceedingly rare.

Some of the witnesses formed unfavorable opinions of the decedent's capacity from his manner of motion. He was a man of active out-door habits, moved quickly, and latterly acquired a shuffling gait, passing through the streets with his head bent downward. This, of course, appeared strange to those not familiar with it. As to his shedding tears when alluding to the sufferings of his grand-child in Australia, or the poverty of his grandson in New York, or his own hard lot and shattered fortune in the decline of life, these were trials adequate to draw tears from one of his susceptible temperament, and it is only his inability of restraint before strangers that evinces a failing mental tone and power. Nor have we sufficiently unfolded and displayed the circumstances attendant upon his losses by endorsements, to know whether they were consequent upon inaptitude for business, or the

imprudence of a generous and confiding disposition, desirous of assisting others without carefully weighing the risk.

Taking then the evidence of the contestants alone, I should say that it exhibited powers of mind impaired or debilitated but partially, and by no means to the degree of testamentary incapacity. He was not in the legal sense of the terms, idiot, lunatic, or of unsound mind and memory. Though he may have forgotten or misstated facts, his memory was still generally good as to all matters of moment or interest, he transacted his own business, and understood his family relations, as well as the state and condition of his property and affairs.

Some statements made, or said to have been made, by the decedent, were controverted by the contestants, for the purpose of elucidating the state of his mental powers. Thus it appears that he had been examined in a suit in the Supreme Court, involving the mental condition of his deceased wife, at the time she had executed a certain deed. A memorandum in his handwriting shows that he was dissatisfied with the decision of the court in that case, and that in his opinion his own testimony was " deficient as regards the sanity of Mrs. Norton," believing her " morally and mentally incompetent to make conveyance of property." But he was not asked his opinion, on the trial, and, according to the printed case, he testified only that in his belief " she knew what she was about when she was quiet," and when he " asked her to sign the deed," and that she did it " passively, quietly." This may all have been true, and yet the party have been " morally and mentally incompetent," a knowledge of what is being done not necessarily including the proper capacity to do it. In other words, I do not understand Mr. Norton as denying the truth of what he did say on that trial, but only in view of the decision of the court, as affirming that his testimony was deficient—not false—but that it fell short—that it was either incorrectly or deficiently stated in the printed case, or had been deficiently elicited on the trial. As to that portion of his written memorandum which alleges that on delivering certain releases to Mr. Clark, he informed him they were *in*

*escrow*, he is contradicted by Mr. Clark on that point, and it is obvious one of the two was mistaken.

Mr. Wright, one of the witnesses for the proponent, stated that the decedent informed him that during Mr. Jefferson's administration he had been sole bondsman for the collector of the port of New York, and a certificate from the proper officer at Washington has been produced, controverting the assertion. A slight mistake of the witness or of the decedent, as to the period of the incident, or as to the officer intended, might readily have occurred, without the main fact being groundless.

Upon the whole, then, I do not think the facts adduced by the contestants sufficient to establish incapacity. Granting all the circumstances alleged, he still had powers of mind equal to the management of his affairs. If any thing were wanting to corroborate this view, it is supplied in Mr. Norton's letters produced by the contestants. They are precise in detail, clear and coherent, and contain indubitable evidence of memory, sense, and judgment. Some of them were written in 1854, after, as well as about, the time of the execution of the will, and in that connection are the most convincing of all kinds of proof. *In literis verum*—the truth shines out in these writings, and we see this aged man as he was.

But on coming to look into the evidence adduced by the proponent to sustain a testamentary condition of mind in the decedent, there is ground for a still firmer conviction of the decedent's competency. The number of the witnesses is not so great as on the part of the parties resisting the probate, but the kind of intercourse and the nature of the facts proved attach weight to the testimony.

Robert Emmet, an old acquaintance of the decedent, testifies that he was in the habit of seeing and conversing with him during the last three or four years of his life, and that during the spring, summer, and winter of 1854, he could not perceive "his powers of mind were at all impaired." He says "He had become very deaf, and it was more difficult to communicate with him, but I had frequent conversations with him on matters of business, and I never perceived any

decay of his mental powers or any want of intelligence on his part; and I knew him so well and felt so much interest in him, that I think I should have observed if there had been a failure of his faculties. I mean his mental faculties, for he had become very infirm and very deaf. I was very intimate with him, I may say from my boyhood; I think he was one of the oldest friends I had in the city. I knew him when he was in the full vigor of his intellect."

Richard Emmet had frequent intercourse with the decedent during the three years preceding his decease, for some period almost daily. He says, "I was consulted by him professionally. I should say his mind was very acute for a man of his age. I never saw any deficiency of mental powers, either in his memory of circumstances relating to the business on which he consulted me, or in relation to his suggestions."

Levi Beardsley knew the decedent forty years, and saw him frequently the last three or four years of his life. He says, "the last year of his life he was evidently failing—wearing out—not as active in getting about as he was the preceding year. His hearing was much more impaired—it was difficult to converse with him. He was sensible enough apparently—as much so as men generally of his age, and much more active than many of them, last summer. I think his memory as to matters which took place many years ago, was very perfect, very tenacious. I never discovered any failure of memory even in his late transactions." Again, "I think he was as able as men of his age generally are, quite as much so. He certainly knew very well what he was about. I considered him childish, more so the last year than the year before. He was more easily affected in his feelings—would easily shed tears—old age, I think, was evidently impairing his mind as well as his other faculties. If I had had property I certainly should not have selected him as an agent. I should think Mr. Carroll might have had a very considerable influence over him. He had capacity enough to resist it, but I think his feelings towards Carroll were such that he would have been very glad to have gratified his wishes. I think he

had the power to resist his importunities, but I doubt if he would, if it was any thing at all reasonable, any thing not extravagant."

Mr. Brady, during several years of late, had opportunities of conversing with the decedent. He mentions an instance in the summer of 1854, when Mr. Norton recalled advice he had given him several years ago as to the preservation of his property. He says, " I have seen no change in Mr. Norton the last three or four years, only he got more deaf. Last summer I tried to make him understand, but could not, and gave it up, he was so deaf. He used to come and sit on my piazza and talk of old times, and of what happened before I was born. I considered him able to know how his property should be managed, but he was getting very old, and certainly could not have had the memory he had had."

Mr. Wright knew the decedent for about four years before his decease, and conversed with him frequently and at length on a variety of topics, generally of local and political history. The witness made the information thus derived the subject of several articles in the papers. He says, " I considered him as having the best recollection of old New York, of any man I had met in the city. I always considered his memory remarkably good." The witness met him the afternoon of the day he was killed, and was told by him that he had abandoned the idea of getting his grandson Carroll into the Custom house, and wished to have him appointed wreck-master. He states, " I saw no signs of decay in his mind then—no exhibition of a decayed mind. I don't mean he had the vigor of intellect he once had."

Horace F. Clark testifies to an acquaintance with the decedent of eleven or twelve years. He met him very often the last year of his life, and shortly prior to his death. He says " he was very aged and infirm, but I have never seen him when I did not think he had testamentary capacity." He was at Mr. Clark's office the afternoon of the day he was killed—the interview lasted two hours, and the principal subject was Mr. Clark's interest in a road at Rockaway. Mr.

Clark states that his mind was clear, and he informed him "with intelligence and memory" on that subject. He adds, "he was, in my judgment, entirely competent to make a will that afternoon. He was more competent to teach than I was to learn on the subject of our conversation, his knowledge of the localities and his memory were so superior to mine."

Mr. Serrall, a city surveyor, had business with the decedent shortly previous to his decease, in relation to some land at 176th street, which he had formerly owned. He had some twenty or thirty interviews with him, and says, "I think his mind and memory were good. He made appointments at various times and places, and was always punctual but once, and then he came the next day and told me why he could not come. He furnished me with a copy of some papers from the Register's office, in pencil in his own writing, which were important in the investigation. He was very deaf; I think he was shrewd and capable of making any bargain that he understood. It was very difficult to make him understand any thing, he was so deaf, unless it was written down—the last interview was a week or ten days before his death, or a little longer." The appointments he made with the witness were in the spring and summer of 1854. "He talked about other things except this property; his general conversation was good."

Mr. Axford, one of the subscribing witnesses to the will, testifies that Mr. Norton was in the habit of frequenting his store and engaging in conversation, that notwithstanding the increasing infirmities of age, "his memory appeared to be very good," and he specifies several facts indicating intelligence and preservation of memory.

I conclude, then, upon a full consideration of all the testimony, that Mr. Norton was in law capable of making a will. Though not unlike the tree to which he once pointed whose boughs and branches were decayed and broken, there was still mind and vitality within. His mental force was doubtless abated, but there was sufficient left to entitle him to the protection of the law in the effectuation of his volition—of

his own free wishes in regard to his testamentary dispositions —the last privilege of life, and rendered still dearer by the desolation and infirmities of old age. But, on the other hand, justice looks also with a jealous eye upon every effort to bend or influence unduly a mind which has passed beyond the period of its full vigor; and it becomes necessary, therefore, to consider whether any traces of fraud, circumvention, or improper dealing are to be detected, leading to the consummation of this will.

The learned French jurist D'Aguessau justly remarks, that there is always difficulty in attacking a holographic will, the presumptions being very strong in its favor; and if the provisions be wise and reasonable, it can be annulled "but rarely and under singular circumstances."—(*Œuvres*, *Tom.*, 4, *Plaid.* 37, *p.* 173.) It is a very important feature in the present case, that the will is in the decedent's own hand-writing. That fact establishes knowledge of its contents, independently of the presumption arising from the *factum*. At the time of the execution, it appears from the evidence of the subscribing witnesses, that he came into the store of Mr. Axford with the will in his hand, and stated that he wished him, his son and daughter to be witnesses to his will—that the law required witnesses; that he had been several times taken ill in the street, and was fearful his life would soon be terminated.— "These things he considered admonitions to him, that it was necessary he should make his will." Mr. Axford, on reading the will, and perceiving that Mr. Carroll was the sole devisee, observed, "you seem to have given everything to Mr. Carroll?" He then said "yes, he was poor—there were others, but they all had enough or plenty." "He appeared to be perfectly sane at the time of the execution of the will—he talked as reasonable as I had ever heard him." Mr. Axford also says, that he understood Mr. Norton to say, "that he had drawn the will without counsel."

As to the state of his feelings towards Carroll, the witnesses very generally agree that it was favorable. Mrs. Spence says, that he used to cry about Carroll, and talked a great deal about him," more than he did of any of the rest. Mr.

Stewart mentions, that he endeavored to interest him to pro-
cure Carroll a place in the Custom-house. Robert Emmet
states, he is very certain the decedent made complaints of
both his sons John and Samuel. Richard Emmet says, he
was employed by him to bring suit against his son Samuel:
and he also testifies, that Mr. Norton told him not very long
before his death, that he had made his will. Mr. Beardsley
says, "I heard him speak of his grandson Carroll. He doat-
ed on him; for two or three years Carroll seemed to be very
much of a favorite with him. He was very proud of him;
made use of very laudatory expressions of his favor. He told
me what happened at Norwalk, in the catastrophe where
Carroll was: he brought me a newspaper about it, and said
he was the worthy son of a worthy sire. He wanted me to
go with him to the collector—he wanted to get an appoint-
ment for him." "I should suppose a man he was so proud
of, must have had influence over him. His affections and
pride seemed concentrated on him the last two years."—"He
said he expected to spend his few remaining days with Car-
roll—his family were all he could rely upon." There is more
evidence of the same kind, which leaves no doubt that the
provisions of this will are not repugnant to the state of the
decedent's affections. The only testimony of an opposite cha-
racter is that of Anne Lew, which is entitled to little weight
against the mass of other proofs in the case.

And now what is the sign of any undue influence? There
is none—and unless it is to be presumed or fairly inferred
from the fact that the decedent's views were favorable to-
wards the devisee, we are left without any grounds for im-
peaching the will. To presume it from such facts, as would
naturally go to show that the will was consonant with his
existing relations and expressed affections towards Carroll,
would be highly unreasonable. Testamentary gifts imply
favor; and yet, if that very favor affords a necessary implica-
tion of the exertion of improper influence, the will which is
most natural, would be the most easily overturned. It is true,
the decedent was fond of this grandson, that he took an inte-

rest in promoting his advancement in life, that at times, he found a refuge and home in his family; but although these circumstances develop grounds for believing that Carroll possessed great influence with him, they are equally grounds for concluding, that the will accorded with the decedent's wishes and preferences.

The exertion of influence to the extent of destroying free agency, will never be presumed merely from opportunity and interest, when there are *indicia* of volition, spontaneousness, and consonance of the testamentary provisions with the state of the affections. Again, so far as Carroll is concerned, there is no trace of complicity. His hand is nowhere seen in the transaction. It does not even appear that he was cognizant of the execution of the instrument—nor that the will was made when Mr. Norton was living with him. Between the evidence of the three witnesses who spoke to the latter point, his residence at the date of the will is left in uncertainty. At any rate, the act was consummated abroad, away from the immediate exertion of any control—among friends, the chosen witnesses of the testator; and was accompanied by declarations, which evinced alike his freedom of action, the occasion of the act, and the reasons impelling to the particular provisions of the will. The instrument was drawn up by himself. He said he had taken no counsel. These are important proofs of spontaneous origination and completion, and of independent volition. The fact that Carroll had been made the decedent's assignee in 1851, should undoubtedly lead to a scrutiny of his conduct, in order to see that he did not abuse or pervert his trust, or the influence thereby derived, if any, to the procuration of improper testamentary provisions. But that done, the court can go no further. A will is not void because made in favor of a trustee. Besides, this was not in its nature a continuing trust for his benefit, and there are but slight indications of its having been an active one.

The contestants also urge, that the decedent's declaration at the time of executing the will—that Carroll was "poor," and "there were others, and they all had enough," was a

delusion as to the other kindred. Now as to this, I would only remark, that the expression if exactly stated, seems to have been intended only in a comparative and general sense. That Carroll was poor, and he and the old gentleman had struggled along together, there can be no doubt—that some of the others were in better circumstances is also apparent. So also, with some of the others he was on terms of affection. But it does not follow, that in preferring Carroll as the recipient of the wreck of his fortune, he believed the others all affluent or all undeserving. Had his estate been larger, it is possible others would have shared in his bounty; but in disposing of the little that was left, his preference of Carroll, considering their intercourse, and the state of his affections, does not seem unnatural. Shall this will then be disturbed on a mere suspicion, which may be entirely groundless, that it was the act of Carroll and not of the decedent? I know that instructions proceeding from a testator are not always proof of volition, because the instructions themselves may have been procured by influence. But still to do away with the usual presumption of spontaneous action derived from instructions, we must have something from which reasonably to infer control or influence—either some sign that the actor was played upon—some indication of an effort to affect his testamentary dispositions, to modify his affections, or take advantage of them; some cognizance of the testamentary act; some trace of fraud, complicity, or clandestinity. In the absence of circumstances of this character,—where not even knowledge of the act is traced to the beneficiary—where it was performed away from him in the presence of witnesses chosen by the decedent, and where every fact down to the very writing of the will, makes the transaction stand out as the act of the decedent alone, the intendment of the law is in favor of its voluntary origination and performance; and that intendment cannot be overthrown by mere surmise. Deeming the decedent possessed of sufficient vigor of mind to make his will, finding no proof in fact, nor by reasonable presumption, of an effort to influence his conduct on the part of the

devisee, and the provisions not being repugnant to the state of his affections, the amount of his property considered, I see no reason why the instrument propounded should not be held duly proved, and must accordingly decree sentence of probate.