Concurring, WRIGHT, GROVER, HUNT and DAVIES, Judges. Affirmed.

---

## COURT OF APPEALS.

JAMES H. SEGUINE, appellant agt. HENRY S. SEGUINE and others, respondents.

A man has a right to make whatever disposition of his property he chooses, however absurd or unjust. If capacity, formal execution and volition appear, his *will* must stand.

The doctrine of inofficious testaments, invoked from the Civilians, has no place in our law.

Where the evidence established most clearly and satisfactorily that the decedent, at the time of making his will, had *full testamentary capacity* to make his will, and acted of his own *free, uninfluenced will and wishes* in making, executing and declaring it, the fact that he gave only a small portion of his large estate to his only son and only child, and a small legacy to a sister, and the remainder and large bulk of his estate absolutely to his brother—these three persons constituting his only near relatives—could have no effect upon the validity of the will.

*December Term,* 1867.

APPEAL from a judgment of the supreme court, affirming a decree of the surrogate of the county of Richmond, admitting to probate the will of James S. Seguine, deceased.

The will in question was executed on the 22d May, 1859, at Rossville, in the county of Richmond, at the house of the testator's brother, Henry S. Seguine. The testator died at his residence, at Deep Creek, in the state of Virginia, on the 11th January, 1860, leaving an only son, James Henry Seguine. The executors named in the will, on the 20th January, 1860,

propounded the same for probate before the surrogate of Richmond county, and it was opposed by the testator's son, on the ground of a want of testamentary capacity in the deceased, and further, that it was procured by undue influence. The question of capacity was principally litigated, the contestant claiming that, through intemperance and disease, the decedent was incompetent to make a will, or if not legally incompetent, was *imbecile*, and in that condition was unduly influenced. The testimony taken before the surrogate fills a volume of 600 pages, most of it on the part of the contestant, relating to the condition and habits of the testator, and of matters transpiring in the summer and fall of 1859, at Rossville, after the making of the will.

It is impracticable to give anything like a precise analysis of the voluminous testimony, nor is it important. The prominent and material facts are referred to in the opinion.

On the 15th October, 1864, the surrogate made a decree admitting the will to probate.

The contestant appealed to the supreme court in the second district, where the decree was affirmed, and he now brings an appeal to this court.

A. W. BRADFORD, *for appellant.*

A. C. BRADLEY and S. HAND, *for respondents.*

WRIGHT, J.   James S. Seguine, the validity of whose will is the subject of this appeal, died at his residence at Deep Creek, in the state of Virginia, on the 11th of January, 1860, at the age of about fifty-five years. He was born in the county of Richmond (Staten Island), his family being an ancient one in the county; but from early life he had resided and was engaged in business in Virginia. His business was mainly lumbering in the Dismal and other southern swamps, but, in connection therewith, he built and owned shares in several vessels employed in the transportation of his lumber and other freight. This business he continued until his

death. He left an only son, the appellant, who was a few months old at the death of his mother, in 1838. His other near relatives were a sister, the widow of a Mr. Guyon, and a brother, Henry S. Seguine. The brother and sister always resided on Staten Island, as did the son, who was reared in the family of the sister; the decedent, after the death of his wife, never marrying again or keeping a domestic establishment. He had lodgings in Virginia, where he spent most of his time, visiting the north in the summer season; and on such occasions, and when north on business, made his brother's house on the island his home.

The decedent had accumulated an estate, at his decease, of probably something over $100,000. With the exception of a farm on the island, formerly belonging to his father, purchased by him in 1858, and fitted up and improved at a cost of some $15,000, as a home for his son, his property was principally personal, consisting of money invested in Virginia and at the north. By his will, executed in May, 1859, some seven months prior to his death, and on his last visit to the north, after giving specific legacies to the amount of $2,000, he gave to his sister, Mrs. Guyon, an annuity of $500; to his son, James Henry Seguine, an annuity of $700, and also an estate for life in the homestead farm, purchased for him in 1858, remainder to the son's children, if no children, to his grand-children him surviving, with a direction to the executors to spend the further sum of $4,000 in improving the farm for the son's use; and to the brother, Henry S. Seguine, the residue of the estate.

No point is made that the requisite statute formalities to sustain the execution of the paper as the will of the deceased were not duly observed; the only question before the surrogate and here being as to the testamentary capacity of the deceased, and whether the will was or was not procured by undue influence of the chief beneficiary. The bulk of the property, it is true, is given to the testator's brother, and it may be conceded that the will is a will inofficious, so far as

regards his son. But if the son had been wholly disinherited (which he is not, but a moderate competency given to him), not in favor of the brother, but of parties strangers in blood to the deceased, it would be no ground of itself for avoiding the instrument. The doctrine of inofficious testaments, invoked from the civilians, has no place in our law. A man has a right to make whatever disposition of his property he chooses, however absurd or unjust. If capacity, formal execution and volition appear, his will must stand.

A "disposing mind (said CRESWELL, J., in *Earl of Seftus* agt. *Haperral*, 1 *Fost. & Finl.* 598) does not mean that he should make what other people think a reasonable will, or a kind will, because, by the law of this country, he has absolute dominion over his own property, and if he, being in possession of his faculties, thinks fit to make a capricious, harsh or cruel will, you have no right to interfere; that would be to make his will for him, and not to allow him to make it."

"The right of a testator to dispose of his estate," said PORTER, J., in delivering the opinion of the court in *Clapp* agt. *Fullerton* (34 *N. Y.* 196), "depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though the provisions are unreasonable and unjust." (*Grindall* agt. *Grindall*, 4 *Hay Ex. R.* 1; *Wendz* agt. *Murray*, 3 *Curt.* 623; *Butlin* agt. *Bary*, 1 *Curt. Ex. C.* 14; *Peck* agt. *Cary*, 27 *N. Y.* 18.)

If the deceased, then, possessed the requisite testable capacity, and the instrument was the free emanation of his will, it is valid, and is entitled to probate; and it is incumbent upon us so to adjudge, much, as in another forum, we might be inclined to regard the narrow provision for the son, in view of the deceased's wealth, as unjust and undutiful. There are, therefore, but the two questions, was there capacity and freedom from restraint.

1st. As to capacity. The evidence as to the general capa-

city of the deceased is but one way. The case is not a balanced one, or one where the evidence greatly preponderates on that subject. The decedent, as has been stated, had been actually engaged in lumbering in Virginia for over thirty years, and according to all the testimony, was an unusually shrewd and energetic business man. His mind was clear, vigorous and strong. He was also a firm man, decided, self-reliant. A witness characterizes him (and this was the tenor of all the proof) as a man of "great capacity for business, remarkable for his firmness, self-reliance and tenacity of purpose." That clearness, solidity and strength were the general mental characteristics evinced by him throughout most of his life is not questioned by the appellant. But it is insisted that disease and intemperance, within the two years prior to his death, effected a thorough change in his mental condition, and that when the will was made he was insane, or if not properly insane, was imbecile. The suggestion that insanity existed in any form, or that the testator's mental faculties were perceptibly impaired at the time of the *factum*, is wholly unsustained by the proof. On the contrary, the proofs establish the fact that at that time his mind was as vigorous and sound as it had ever been. The instrument was prepared by Lot C. Clark, Esq., for many years his legal adviser in relation to his affairs at the north. Mr. Clark was alone with him in his room, at his brother's house, some two or three hours, conversing in respect to his property; receiving his instructions; getting his exact views in regard to the provisions of the will, his slaves, and the laws of Virginia and North Carolina as to them; and in drawing the instrument, as it was finally executed. All the directions for drawing it were given by the decedent without a suggestion from any other person. He exhibited a will made by him the year before, and which had been drawn by Judge Metcalfe, the surrogate of the county. and suggested the alterations he desired to make, assigning his reasons therefor. He named as witnesses Dr. Edgar, for many years

his attending physician when visiting at the north, and Judge Winant, a friend from boyhood, and requested Mr. Clark himself to sign as a witness. According to the testimony of Mr. Clark, he "was as clear in mind and faculties as he had ever known him," "his mind was perfectly sound and clear." Dr. Edgar, being familiarly acquainted with his physical constitution and habits, and mental characteristics, "considered him of sound mind;" and Judge Winant, the other subscribing witness, concurred with them in these opinions. Judge Winant, after the will was executed, conversed with him at large respecting his health, and in reference to internal improvements in which he was interested in Virginia; in which conversation he indicated no defect of mental capacity, but full intelligence. He subsequently dined with the family. In addition to this proof, eight witnesses, residents of Virginia, knowing him well for many years, testified that down to his leaving Deep Creek for the north, some ten days before the will, his mental condition remained as good as they had ever known it; and Dr. Anderson, called as a consulting physician three days after the will, represented his "intelligence to be perfect." This evidence, which was wholly uncontradicted, tends to but one conclusion, that instead of the decedent being a person of permanently disordered intellect, at the execution of the will, there was no sensible indication that his rather unusual power of mind had ever begun to decay. He was, it is true, broken in health, having from youth been a sufferer from gout, which was hereditary, and which at length caused an affection of the heart and dropsy, the latter diseases developing themselves in connection in the spring of 1859. Such constitution as he had was nearly broken down, and though death was not to be immediately apprehended, the issue, as the physians who examined his case some three days after the will, expressed "to be merely a question of time." But no one intimates that his bodily infirmities had then, if ever, created any mental disturbance, or enfeebled his intellect in

any appreciable degree. Neither has the suggestion any foundation that indulgence in intoxicating liquors had thus impaired his mind. It appears, that although not wholly abstaining, he had for most of his life been abstemious in the use of liquors. A year or two before his death he indulged in a more free use of it, but not apparently to excess, at least, before the summer and fall after the will. In 1858 he spent the months of May, August and September at Ross-ville, where he could not have drank to any marked extent, for no one suggests that he was ever under the influence of liquor in the slighest degree. Prior to his visit to the north in 1859, he was shown to have been partially affected by it in two or three instances in Virginia, but was never seen intoxicated. Nor was he under its influence to any extent when the will was made.

In view of these facts, there is no color for saying that his indulgence in intoxicating liquors previous to the *factum* had affected his mind or his capacity to make a will. Nor, if it were at all important, does the evidence warrant the conclusion that his use of stimulants, during his stay and last illness at Rossville, after the will, reduced his mind to a state of general incapacity for the performance of a testamentary act. Such a conclusion is at war with the general facts of the case. There is no pretence that his drinking incapacitated him for business, or prevented him from attending to and controlling his business affairs. It indisputably appears that his business operations went on as actively as ever under his direction; and no matter relating to his affairs or property, north or south, however slight, anybody ventured to touch, without his previous authority. Those who speak most unfavorably of his habits represent him as constantly exercising memory, will, discrimination, firmness, and all the attributes of perfect intelligence. The habit of drinking undoubtedly grew on him as he sunk under his complicated ailments, and it may have tended in some degree to weaken his mind, but down to his departure for Virginia,

some two months before his death, nobody pretends that he was imbecile. Indeed, the evidence distinctly indicates that up to this time he retained nearly his full strength of intellect.

The will then, is not impeachable on the ground of testamentary incapacity. There is no room to doubt that when it was executed the testator was fully competent. Bodily disease may have abated some of the former elasticity of his mind, but it was in no way *diseased,* or even in an incipient state of decay.

2d. There being capacity, was the will the free act of the decedent, or was it the result of undue influence exercised by his brother, the principal beneficiary? This latter question was not argued with any apparent confidence by the appellant's counsel, and I cannot well see how it could have been. Undue influence must be an influence exercised by coercion, imposition or fraud. It must not be such as arises from the influence of gratitude, affection or esteem, but it must be the ascendancy of another will over that of the testator, whose faculties have been so impaired as to subject him to the controlling influence of force, imposition or fraud. (*Gardiner* agt. *Gardiner,* 34 *N. Y. R.* 162; *Dean* agt. *Negley,* 41 *Penn. R.* 312; *Small* agt. *Small,* 4 *Greenl.* 220; *Trumbull* agt. *Gibbons,* 2 *Zabriskie, N. J. R.* 117.) Moreover, the exertion of the influence upon the very act must be proved, and it will not be inferred from opportunity and interest. (*Carroll* agt. *Norton,* 3 *Bradford,* 320; *Clapp* agt. *Fullerton,* 34 *N. Y. R.* 190.) I can discover nothing in the record that brings the case within the rules. The circumstances anterior to and attending the execution of the instrument are inconsistent with any other hypothesis than that it was the product of the decedent's own will, and not of the force, fraud or undue influence of any other. The fact is unquestioned that he was a man of more than ordinary vigor of intellect, of great firmness, self reliance and tenacity of purpose, and it is clear from the evidence that he retained his unusual powers

.of mind down to the period of making the will. He was not, therefore, in a condition to be exposed to undue influences. But the case is barren of evidence of any direct influences —much less those improper influences which will vitiate a testamentary act—exercised by the brother to procure the will. It may be that the decedent was unjust to his son, the appellant, in the disposition of his property, and that the brother should not have been selected as the chief beneficiary, but there is nothing rising to the dignity of proof of any undue influence or contrivance on the part of the latter to affect the result.

In its dispositions, in parts affecting the son and the brother, the instrument was similar to one made by the testator the fall previously at Rossville, except that the annuity to the son was reduced from $1,400 to $700. It is possible that the brother knew what this will of 1858 contained, but there is nothing to base a conjecture upon that he interfered in any way to bring it about. As to the will in question, the proof is equally decisive as to non-interference on the part of the brother.

It appears conclusively that the alteration of the will of 1858, by halving the son's annuity, was in accordance with a design of the testator, conceived in Virginia the winter previously; a design and result over which the brother had no possible influence in the nature of the case. The instrument was drawn in the room of the decedent, he being alone with Mr. Clark, his counsel. The instructions proceeded solely from him. The brother was not present at any time during the two hours spent in the act. He knew that the testator was making his will, as did the testator's sister, Mrs. Guyon, who was in the house at the time, but that he was any more cognizant of the contents of the instrument being executed than the sister, there is not the slightest proof. True, the *factum* was at his house, but that was the decedent's only home and resort at the north.

There was some evidence, also, that he conveyed the mess-

age to Mr. Clark to come and draw the will, but his agency in respect to that message was not only natural, but affirmatively shown to have been in obedience to the wish of the decedent, conceived in Virginia before starting for the north.

In view of this state of facts, there is no ground for alleging that the decedent in publishing the instrument and dictating its contents was not acting of his own free, uninfluenced will and wishes.

There is much evidence in the case of matter transpiring at Rossville subsequently to the will. An allusion to it is unimportant.

The point of inquiry as to the testamentary capacity and the exercise of undue influence or fraud is before or at the time of the *factum*. Subsequent occurrences cannot affect the legal aspects of the case.

I am of the opinion that the questions of fact involved were rightly decided by the surrogate, and that the judgment should be affirmed.

Judgment affirmed.

It is understood that this was the last opinion ever delivered by Judge WRIGHT.

———◆◆———

## SUPREME COURT.

