NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—August, 1882.

PHILLIPS V. CHATER.

*In the matter of the probate of the will of* HENRY J. PHIL-
LIPS, *deceased.*

The doctrine of *testamentum inofficiosum* has no place in our law.

The mere fact of the exclusion of a wife, by her husband's will, from any
share in his estate is no ground of objection to the instrument.

The efficiency of the prevailing method of inquiry concerning the sanity of
alleged testators, by hypothetical questions addressed to medical ex-
perts called by the examining party,—estimated.

By a sound mind, within the meaning of the law respecting testaments, is
not meant a mind which is perfectly balanced, and free from all preju-
dice and passion.

Where probate of a will is opposed on the ground of an insane delusion on
the part of decedent concerning contestant, and the court finds itself
able to understand how a person, situated in all respects as the deced-
ent was, might have believed all which the evidence shows that he be-
lieved, and yet have been in full possession of his senses, contestant's
case is unproved.

Boughton v. Knight, *Law Rep.* (3 *P. & D.*), 68—approved.

PETITION, for the probate of decedent's will, by Richard
D. Chater, one of the executors therein named; opposed
by Frances C. Phillips, decedent's widow.   The facts ap-
pear sufficiently in the opinion.

WILLIAM IRWIN, *for petitioner.*

TOWNSEND & WEED, *for contestant.*

THE SURROGATE.—The decedent died in this city, on
the morning of Friday, October 10th, 1879. On the Mon-
day previous he had come to New York from Englewood,

N. J., where he had been visiting. While here he called upon Mrs. Vanderschroeff, an intimate friend, who was living in the family of Mr. Louis C. Waehner. He stayed there almost all day, and, complaining of illness in the evening, expressed a wish to remain for the night. As it was impracticable, however, to afford him a room, he secured one in a hotel, to which he was accompanied by a friend. In the afternoon of the next day, he called again at Mr. Waehner's, and, soon after entering the house, gave such indications of serious illness that a bed was prepared for him in the back parlor, to which he immediately resorted and from which he never arose.

On Thursday, October 9th, he gave to Mr. Waehner, who is a practicing lawyer, instructions for the preparation of his will. Mr. Waehner thereupon made a draft, which was submitted to the decedent, and was pronounced by him to be in a certain particular incorrect. A change was made, conformably to his direction, and the instrument here propounded is the result. It seems to have been executed in compliance with all the requirements of law, and must be admitted to probate as the last will of decedent, unless it shall be determined upon the evidence that he was, at the time of its execution, incapable of making a testamentary disposition of his property. This instrument, bequeathing certain legacies, divides his residuary estate between a sister living in England and her three daughters.

The legacies are as follows: Mrs. Vanderschroeff is given $3,000 and certain household furniture; Dr. Jones, the attending physician, $500, together with decedent's books and surgical instruments; Mrs. Waehner, Mr. Randolph, and the two children of Mr. Chater (who is named as

decedent's executor), $500 each; and Mr. Chater himself, a gold watch.

These beneficiaries were some of the very intimate friends of the decedent. Others had been taking care of him, during the brief illness which preceded the execution of the alleged will, and he might well have supposed that, if his life should be prolonged, he would need to make additional drafts upon their sympathy and attention. The decedent had no child, father or mother. He had two adult brothers, neither of whom resided in this country, and a sister, who is one of the residuary legatees, as has been already stated. But for the fact that he left a wife surviving, whom the will does not mention, there is nothing in its dispositions which could be thought unjust or eccentric or for any reason worthy of comment. But it is claimed in behalf of Mrs. Phillips, who appears here as contestant, that her exclusion from any share in her husband's estate was directly due to an insane delusion on his part that she was not a dutiful and affectionate wife. The courts of this State have repeatedly declared that such an exclusion is not of itself sufficient to invalidate a will—that the doctrine of *inofficiosum testamentum* has no place in our law; that "a man has a right to make whatever disposition of his property he chooses, however absurd or unjust" (Seguine v. Seguine, *3 Keyes, 665*), and that such right "depends neither on the justice of his prejudices nor the soundness of his reasoning" (Clapp v. Fullerton, *34 N. Y., 196*). But it is so rarely the case that a testator, whose wife is living at the time he executes his will, fails utterly to make any provision for her benefit that, at the very threshold of this inquiry, it seems proper to consider what is the probable explana-

tion of the fact that the name of Mrs. Phillips does not appear in the instrument here offered for probate.

Without any reference, at present, to the causes which led thereto, it is an undisputed fact that, near the close of the year 1878, the decedent and his wife separated, and never afterward lived together. So far as the evidence discloses, Mrs. Phillips does not appear to have said or done anything, after the separation, which was in the least calculated to soften her husband's resentment or bring about a reconciliation. In a letter to one of his friends, which seems to have met his eye, she alluded to him, on January 27th, 1879, as a man "too despicable and contemptible for anybody to associate with." She also wrote to Mr. Phillips, during that year, several extraordinary letters and postal cards, which were put in evidence by the proponents. The latest bear date in July, not long before his death. In one of them, which was written in that month, after alluding to the fact that he had ceased to contribute to her support, she says: "As you have not yet procured a divorce from me, you are scarcely authorized in throwing me on the town." She adds that she has reported him to the Adjutant-General, who has advised her that sentence of a court martial will not result in any advantage to herself. "There is where he is much mistaken," she writes, "for it would be of the greatest benefit to see you properly punished, as you deserve, for your contemptible, mean, cowardly conduct." Again, in another letter: "As you continue to talk abominably of me, I will now begin to act. Within ten days I shall be in Washington, and rest assured that, if I can do you a friendly turn, I will not fail to do so. . . . you have some one watching me, and so have I you." And still

again: " Whatever kind of divorce you get, allow me to tell you I am already engaged to be married.   I congratulate you on your engagement to that old woman.  I wish her joy.   A worse fate I could not wish for my bitterest enemy.   She is quite welcome to you.   .   .   .   The old woman can support you without a commission.   She must be fond of superannuated cripples."  There are other communications of a similar character.

It seems to me that it is not difficult to understand how a thoroughly sane man, receiving such letters as these, might be tempted, if of a resentful disposition, to exclude the writer from sharing in his posthumous estate, and might readily succumb to the temptation.   To ascertain, however, whether, as claimed by the contestant, the estrangement between the decedent and herself, which culminated in the separation of December, 1878, grew out of " insane delusions " with which he was afflicted, it is necessary to review the history of their married life. There is such a mass of testimony upon this subject that it is impracticable to refer to it in minute detail; and such a reference, indeed, would be profitless.

The parties were married in 1865, when the wife was about eighteen and the husband between fifteen and twenty years older.  He had been a surgeon in the British army, and had also been attached for a time to the army of the United States, during the late war.  After his marriage, he again entered the service, and continued to hold his commission until his death.   This necessitated a roving life, which, perhaps, contributed in some degree to the domestic discord with which the career of himself and wife abounded.   He was jealous and exacting and tyrannical, and manifestly entertained and sought to en-

force certain sentiments as to a wife's subordination to her husband which naturally did not commend themselves—and perhaps ought not to have commended themselves—either to her reason or her inclination. Partly as a result of this difference of views, and partly for other causes, there were frequent quarrels between them before 1874, and while they were living at various places in the south and west where the decedent was stationed by order of the War Department. Such was the case, also, for the three years succeeding, when they resided in or near New York.

A dispute of a more serious character than usual led to their temporary separation in the summer of 1878. When they were living in New Jersey, the contestant came to New York and remained here for a time, until, through the mediation of their respective attorneys, she and her husband fancied themselves reconciled. After residing together for a few months in this city, there came about the final separation which has been mentioned already. In February of the succeeding year, the decedent took steps for procuring a divorce, and, to that end, caused a proceeding to be commenced in Washington, D. C. He swore, in his complaint, that he had been a resident of the District of Columbia for two years, and that he did not know the place of residence of his wife. These statements, and perhaps some others which the complaint contains, were utterly false. The Washington suit was not pursued beyond the filing of the papers in the office of the clerk of the court. Two months later, however, under the guidance of certain somewhat notorious divorce lawyers of this city, Mr. Phillips swore to another complaint; but that proceeding, like its predecessor, died in

infancy. Still another action, and the only one in which Mrs. Phillips was served with a summons, was commenced about the same time in the Supreme Court of this State, and was pending at the date of the decedent's death, an answer having been interposed in his wife's behalf. There is some evidence that he harbored the idea of instituting divorce proceedings in Oregon as early as 1873, and that he consulted a lawyer upon the subject; though it does not appear that any more serious or definite steps were ever taken in the matter.

In connection with one of these divorce suits, a certain Dr. Auris plays a conspicuous part. He was called as a witness for contestant, and testified that, in the spring of 1879, he entered into a very contemptible plot with the decedent, by which it was agreed that, after escorting to the theatre Mrs. Phillips and another lady living in the same apartments, he was to return with them, and, in the sight of hired detectives employed for the purpose of swearing to what they should observe, he was to appear at the door of the room in half undress, so as to give color to the imputation that he had been criminally intimate with decedent's wife.

Auris swore that this plan was in fact consummated; that he received from the decedent the sum of $100 as a reward for his infamy; and that, when he was asked to fulfil the conditions of his contract by making an affidavit, for the use of decedent's lawyer in the divorce litigation, he refused to do so.

Perhaps the most charitable comment upon this conduct which is within the range of human ingenuity was made by contestant's counsel, who has suggested that Auris "did what he could to rectify the wrong he com-

mitted in taking the money, by refusing afterward to make the affidavit." Auris testified upon the trial that he gave a false account to the decedent of what actually took place after returning from the theatre; informing him, as he did, that the detectives had heard himself and Mrs. Phillips exchange words of endearment, while, in fact, no such thing occurred. One of the detectives, who seems to have made valuable contributions to this villainy, was also called in behalf of the contestant. He testified that he was employed by the decedent (who told him of the scheme which had been devised by himself and Auris) to assist in its accomplishment. If he is to be believed, he proceeded, at the proper time, to perform the part assigned him. But his story of what occurred essentially differed from that of his alleged co-conspirator; for he swore that he discovered enough to satisfy him of criminal intimacy between Auris and Mrs. Phillips, and that he so informed the decedent. It appeared that this detective had previously given a different version of the affair, which out of abundant caution, had been put in the form of an affidavit, and that through the procurement of one of the divorce lawyers, his adherence to that version, which substantially agrees with one of the stories of Auris, had been made additionally secure, as was doubtless supposed, by the payment of $50, which had been awarded him under the thin guise of compensation for the time which would probably be consumed in his cross-examination.

How much truth can be gleaned from the joint and several testimony of this pair of wretches it is difficult to tell. But, after letting the whole story lie in my mind until it has nauseated me, I am inclined to believe that

the decedent was a willing party to a scheme for procuring false evidence to be used against his wife in his proceeding for divorce.

It is quite unnecessary to characterize this conduct. It has only been needful to describe it for disclosing the facts upon which rests the contestant's claim that the decedent, in his devotion to the enterprise, was influenced by the promptings of an unsound mind.

Now, does his behavior, in connection with those divorce proceedings, tend to establish the existence of an "insane delusion" touching the purity of his wife? There are many circumstances, some trivial, some important, which lead to the contrary conclusion. Several of the witnesses, for example, testified to a certain freedom of intercourse between Mrs. Phillips and army officers stationed at posts where her husband was assigned for duty. Her conduct was thoroughly innocent, for aught that is established by the evidence, but it sometimes occasioned remark, and always angered the decedent, who was apparently of an inordinately jealous disposition. The intimacy between Auris and his wife was another circumstance which may very likely have excited a mind constituted like his, and the statements which Auris and the detective made, as to what took place after the former returned from the theatre with Mrs. Phillips, might well have furnished reasonable ground for his distrust. I certainly do not mean to intimate, in the least, that there was any just foundation for such vile suspicions, but simply to assert that the existence of the suspicions, under all the circumstances, may have been quite consistent with the decedent's sanity. What is an "insane delusion?" Bouvier, in his law dictionary, defines a "de-

lusion " to be " a diseased state of the mind, in which persons believe things to exist which exist only in their own imaginations, with a persuasion so fixed and firm that neither evidence nor argument can convince them to the contrary." Tried by this standard, I can find no warrant in the evidence for holding that Dr. Phillips was suffering from any delusion whatever in relation to his wife. He does not, indeed, seem to have been constant in his opinion of her infidelity, for on several occasions he was apparently in the state of mind which was illustrated by his remark to the witness Grant, that " sometimes he believed it, and at others he could not." This is by no means the condition of a monomaniac such as he is claimed to have been. "A sane man in error," says Wharton, " retains the power of doubting; not the madman " (Med. Juris., *4th ed.*, § *727*).

In the case of Boughton v. Knight (*Law Rep., 3 P. & D., 68*), the presiding Judge, in charging a jury, gave what seems to me a very simple and practical standard, applicable to such a case as the present. " The tribunal that is to determine the question," says the learned Judge, "must of necessity take his own mind as the standard whereby to measure the degree of intellect possessed by another man. You must not arbitrarily take your own mind as the measure in this sense, that you should say . . . *I* should not have believed such and such a thing, and, therefore, the man who did believe it was insane. But you must of necessity put to yourself this question, and answer it: Can I understand how *any man* in possession of his senses could have believed such and such a thing? And if the answer you give is, I cannot understand it, then it is of the neces-

sity of the case that you should say the man is not sane."

In the present case, the court finds no difficulty in understanding how a person situated in all respects like the decedent might have believed all that the evidence shows he believed, and yet have been in full possession of his senses.

The situation is well put in the form of a dilemma by the proponent's counsel: "If the reports of the detectives were true, the decedent surely labored under no delusion; if the reports were not true, they were still evidence on which he could act without rendering what he did the result of insanity. If no such reports were made, or if he never believed his wife to have been guilty, then he can be accused of depravity, but not of insanity."

The disclosures of his character and conduct, upon which I have not yet commented, have all been considered in reaching the conclusion just stated. He was an educated man, who knew how to be agreeable, and often put his knowledge into practice; but he knew how to be disagreeable, particularly to his wife, and took frequent opportunities to prove it. He was capricious in his moods: often irritable, sometimes violent, always jealous. His temper may well have been affected by his bodily ailments. He was a sufferer from gout, from neuralgia and from iritis, a painful disease which almost deprived him of the use of his eyes, and might naturally have had a similar effect upon his cheerfulness and good temper. There is some evidence, also, that he was subject to occasional paroxysms in the nature of epileptic fits, though it seems to me too inexact to afford a basis for any serious conclusions.

Aside from the medical evidence to which I shall presently refer, the main reliance of the contestant seems to be placed upon the testimony of Mrs. Cridland, a sister of Mrs. Phillips, of Mr. Cridland, her husband, and of a Miss Taylor, all of Mobile, Alabama. This testimony was taken under a commission, in response to interrogatories, and is, for that reason, in some respects unsatisfactory.

Mr. Cridland is very graphic in his description of the disagreeable traits of decedent's character, and of the marked contrast which he observed, in this regard, between him and Mrs. Phillips. He describes the husband as "rude," "violent," "irritable," "jealous," "suspicious," "morose." He depicts the wife, on the other hand, as always "kind," "patient," "gentle," "cheerful," "prudent," "forbearing," "considerate." "Her deportment," he says, "was in every respect such as became a lady of good manners."

To substantially the same effect is the testimony of Mrs. Cridland and Miss Taylor. They agree in the belief that the behavior of such a husband to such a wife was highly irrational.

I am compelled in the light of all the evidence, to regard this Mobile testimony as somewhat biassed in favor of the contestant.

It would be strange, indeed, if it were otherwise, and if her immediate family and friends had not ranged themselves on the side of Mrs. Phillips in the unhappy controversies which embittered her domestic life. And, besides, the judgments which these witnesses formed, as to the conduct of the decedent, were based upon their supposed knowledge of the exact relations between him-

self and wife. This knowledge, however, they do not seem to have possessed. The nature of the letters and postal cards from which certain extracts have been quoted, justifies the belief, that, with a secretiveness, for which she deserves to be commended rather than censured, Mrs. Phillips must have concealed from them, as far as lay in her power, the daily fret and worry of the relations between herself and her husband. She might naturally have thought it justifiable, both in taste and morals, for one who had a skeleton in the closet to keep the door shut,

Dr. William H. Holcomb was called by the contestant, and a hypothetical question was propounded to him touching the decedent's sanity. In this question were grouped most of the important facts which her counsel claimed to have established, and the inferences which they were supposed to justify, Dr. Holcomb was asked whether, upon the assumption that such hypotheses were true, the decedent was or was not insane. He answered in the affirmative. In cross-examination, the proponent's counsel eliminated, one by one, the elements of the hypothetical question, and put contrary hypotheses in their places. The witness clung with considerable pertinacity to his original answer, but finally consented to some modification. Without intending the slightest reflection upon the honesty of his purpose or the accuracy of his judgment, I feel justified in saying that this examination affords a good illustration of the practical inutility of expert testimony, under our present system of inquiry into cases of alleged insanity. When a physician is called by a party as a witness, he is, in most instances, summoned because his pre-ascertained

views meet this party's necessities. The hypothetical question which is addressed to him contains, of course, that presentation of the evidence which counsel hopes will be accepted as proved by the tribunal which is to decide the issues. Variously modified in its form according to the particular features of particular cases, the real gist of the question, if it is put by one who seeks to establish insanity, is this: "If the person whose mental condition is the subject of inquiry is of unsound mind, is he sane or is he insane?" The answer which invariably follows is that which, to the logical mind, seems unavoidable. Then ensues the cross-examination, in which counsel for the other party presents a different set of hypotheses in an interrogatory which, being translated, is substantially as follows: "But if, on the contrary, this person of whom you are testifying is of sound mind, is he insane or is he sane?"—a question which, like the other, is answered in the asking.

From a somewhat extensive experience in the trial of causes involving the issue of insanity, I can say, in all seriousness, that the testimony of expert witnesses, under the system of selection and examination now in vogue, often furnishes as little aid to the court as would be afforded by precisely such an examination as the foregoing. It is only saying of the present case what might be truly said of many another, that the court must, in the main, look outside of the expert testimony to find the evidence upon which it can safely base its conclusions.

Without further analysis of the facts, it seems sufficient to say that they fall far short of proving that, at the time when he executed the instrument here offered for probate, the decedent was not of sound mind.

By a sound mind, within the meaning of the law, is not meant a mind which is perfectly balanced and free from all prejudice or passion; else the circle of competent will makers would be, indeed, a narrow one.

This decedent may have conceived false and unjust notions of his wife's character and conduct; he may have been prompted by mean and unworthy motives to exclude her from sharing his estate, but his notions and his motives alike were, in my judgment, entirely sane.

A decree may be therefore entered, admitting to probate the instrument here propounded as his will.