NEW YORK COUNTY.—HON. D. G. ROLLINS, SURRO-
GATE.—April, 1883.

## HAGAN v. YATES.

*In the matter of the probate of the will of* ALONZO C.
YATES, *deceased.*

The question of fact, whether the name of A. C. Y., appearing at the end,
and in the margins of the several sheets of a paper propounded as his
will, was a forgery, determined in the negative.

Special precautions are necessary in admitting to probate a paper propound-
ed as the will of a decedent, where he is shown to have suffered from
grave personal infirmities, *ex. gr.*, to have been blind or illiterate, or
weak and low from bodily suffering, or broken and infirm because of age.
But if he was in the prime of life, and in the full possession of his bodily
and mental faculties, if his preparations for making the will were not
hurried, if he was trained in the methods of business and accustomed
to execute papers involving important concerns of life, the mere pres-
ence of his signature in its appropriate place, upon a testamentary paper
otherwise properly executed, raises the presumption that its provisions
are in conformity with his wishes.

The retention, by decedent, of a testamentary paper in his own possession,
for an interval of two years after execution, is a circumstance of the
highest importance to negative a claim, by a contestant of the probate,
that provisions had been inserted therein of which decedent was igno-
rant, and at variance with his instructions.

Contestants, for the support of their allegations of undue influence exer-
cised upon decedent in respect to his will, were compelled to rely almost
entirely upon the facts that proponent, decedent's second wife, had op-
portunity to influence him, and that the will, while it made munificent
provision for her, was both ungenerous and unjust to the family of his
first wife.—

*Held,* no proof.

A decedent may use his will for displaying kindly or vindictive sentiments,
may indulge, if he choose, his whims, spite, vanity, egotism, or ani-
mosities, to the top of his bent; yet his wishes must be respected by the
courts, at least to the extent of adjudging that they be made effectual,
provided only that he is not deficient in mental capacity, and is ob- .
servant of the forms established by law for the execution.

PETITION, for the probate of decedent's will, presented by Agnes Sarah Yates, his widow, and another; opposed by his daughters, C. V. Hagan, and L. M. Dickel. The facts appear in the opinion.

J. H. STRAHAN, *for proponents.*

H. M. WHITEHEAD, *for C. V. Hagan.*

JOHN D. TOWNSEND, *for L. M. Dickel.*

THE SURROGATE.—The decedent died in this city in October, 1880, leaving an estate valued at more than half a million dollars. The instrument here offered as his will purports to have been executed nearly two years before his death, in the month of November, 1878. At that time, he had been twice married. By his first wife he had two children, Cornelia and Lillian, who now bear the names of Mrs. Hagan and Mrs. Dickel, and are the contestants in this proceeding. By his second wife, also, he had two children, Alonzo and Inez, to whom, upon the death of their mother, the paper here propounded gives the bulk of the estate.

The objections interposed to the probate of this paper, so far as they find any support in the evidence, are three:

1st. That the instrument is forged, and was never signed or executed by Alonzo C. Yates.

2nd. That, if it is not a forgery, and if it was in fact signed and executed by him, such signing and execution were brought about by the fraudulent contrivances of proponent's attorney, under whose direction the document was prepared, and who, without the knowledge of decedent, but with the probable connivance of his wife, Agnes S. Yates, substituted, in the place of a paper writ-

ing which the decedent had examined and approved, and desired to execute as his will, all or a part of the sheets now constituting the instrument here in dispute, and thus procured the signature and the apparent sanction of the decedent to a paper whose contents were to him either wholly or partly unknown.

3rd. That, if the decedent signed and executed the paper, not only in the precise form which it now wears, but with full knowledge and approval of its contents, he was induced so to do by undue and illegal influence exercised by Agnes Sarah Yates, his second wife, either alone or in conjunction with the decedent's attorney, or with some other person unknown. The formal objections on the files of the court also contain allegations that Mr. Yates lacked testamentary capacity. This claim, however, seems to have been practically abandoned by the contestants. In the early days of the trial, some slight evidence was introduced in its support, but this was afterwards met by the opposing testimony of so many persons who had had intimate business and social relations with Mr. Yates that his competency to make a will may fairly be stated as beyond dispute. The other objections will be considered in their order.

*First.* Is this a forged instrument? It is written on legal cap paper and covers eight pages. In the margin of each of the first, third and fifth pages are the letters "A. C. Y.," which constitute the initials of decedent's name, and which the proponents contend were written by him at the time the paper was signed and executed. Near the bottom of page 8, in its appropriate place at the foot or end of the instrument, appears the full name "Alonzo C. Yates."

The document consists of four distinct pieces of paper. Of these the first three pieces are each half sheets of legal cap, with ragged tops, indicating that they became halves by the process of tearing. No two of these, so far as the evidence discloses, were ever united in a single sheet. The fourth piece is an entire sheet, similar in its general appearance to the other three, but so unlike them in some respects as to demonstrate that it was never taken from the same lot or package of stationery. The latter half of this sheet has upon it no writing, except that on its outer page, it bears an indorsement which indicates that within is the "last will and testament of Alonzo C. Yates, dated November 26th, 1878."

From this description it is evident that, if the final signature and the initial letters "A. C. Y.," in the three places where they occur, are in the handwriting of this decedent, each of the four separate pieces of paper which, in combination, constitute the instrument offered as his will bears marks of his own distinct and positive authentication, the initials authenticating the first, second and third of those pieces and the full signature the last.

Now are these marks genuine? The printed report of the testimony is before me. It contains more than 400 pages, well nigh half of which are devoted to this issue alone. Scores of signatures claimed to be in decedent's handwriting, and whose genuineness has not been disputed, have been put in evidence for purposes of comparison with the writings which are the subject of controversy, and several witnesses professing to be skilled in matters of handwriting have been afforded an opportunity of presenting a pleasing variety of speculations, in relation both to the general subject of identifying signa-

tures, and to the particular inquiry whether those which are here in dispute were or were not written by the hand of Alonzo C. Yates.

Any protracted discussion of this branch of the controversy seems unnecessary, in view of the fact that the conclusion which the court has reached in regard to it seems to be shared by the counsel of one at least of these contestants. He declared in his oral argument, and reasserts in his printed brief, that he believes the decedent himself affixed the initials to the first, second and third leaves of the instrument in dispute and the full name at its close. After carefully reviewing the evidence, I find nothing in the testimony of any witness which in the least shakes my confidence in the correctness of this conclusion. The decedent wrote an exceptionally scrawly, irregular, awkward hand. In the shape of the letters, their size, their slant, their distance apart, the fashion of their junction —in divers respects beside—in almost every respect, indeed where there was room for variation—his writing at one time seemed to differ not a little from his writing at another.

A signature chosen at random from the multitude before me would be likely, I think, to show quite as marked points of dissimilarity, if compared with any of the rest, as would the will signature subjected to the same test.

I should not distrust, therefore, the genuineness of that will signature, or of the marginal letters " A. C. Y.," because of any suspicious or doubtful appearance which they present, even in the absence of direct testimony that they were actually written by Mr. Yates. But that direct testimony is positive and unequivocal. Two witnesses, Mr. Strahan and Mr. Waterbury, assert

that they saw the decedent place his initials on pages 1, 3 and 5, and sign his name on page 8, and that, upon this last page, they straightway affixed their own signatures as attesting witnesses. The names of Mr. Waterbury and Mr. Strahan are now apparent upon the face of the paper. That they are respectively in the handwriting of those gentlemen is not disproven; nor has there been the faintest suggestion to the contrary. Unless, therefore, both of these witnesses have deliberately sworn falsely, the signature which they attest, is beyond any doubt, reasonable or unreasonable, that of Alonzo C. Yates. One of these witnesses I am urged to discredit, but, as to the other, the honesty of his purpose is unassailed, and if he is to be believed, the contention that this paper was not signed by the decedent absolutely comes to naught.

*Second.* It is claimed that the decedent, even if he executed the instrument here propounded as his will, did so under a misapprehension of its contents, and in ignorance that it contained certain provisions and dispositions which have chiefly occasioned the present controversy.

I will briefly review the circumstances upon which this claim is based. The testimony shows that, in the spring of 1878, the decedent executed a will differing from the document now in dispute in some respects, and particularly in the fact that it made more liberal provision for his daughters by his first wife. In September of that year, he went to the office of his attorney, Mr. Strahan, taking that will with him, and pointed out certain alterations which he had himself made upon its face, apparently in the faith that no legal formalities were necessary to make his changed purposes effective. Upon learning his mistake, he left the document, that another, contain-

ing like provisions, couched in legal phraseology, might be prepared for execution. Between that time and the 26th of November following, several conferences were had between him and his attorney, which led to other changes both in the form and substance of the proposed will.

At last a completed paper was prepared by Mr. Waterbury (a clerk in Mr. Strahan's office), which was understood by him, upon Mr. Strahan's representation, to contain precisely what the decedent desired to establish as his will. Mr. Strahan, when the document was submitted for his inspection, objected to the appearance of its last sheet because the formal clauses at the close were separated, covering as they did the bottom of one page and the top of another. The sheets were at that time united by two metallic fastenings with double points, the insertion of which had, of course, made four holes in each leaf of paper through which they had passed. Those fastenings were removed, the last sheet was discarded, in its place was substituted another, containing upon two pages the matter which had previously spread over a larger space, and the whole were connected as they had been connected before.

The instrument thus prepared is the one which, according to Mr. Strahan's testimony, was delivered to the decedent, was finally executed by him as his will on the 26th of November, 1878, and is now before this court for probate. Mr. Waterbury does not have a distinct recollection of the contents of the various drafts which he prepared, or of the nature of the several alterations, and he does not even profess to know whether the paper here propounded is precisely the same as that with which Mr. Strahan

finally declared his satisfaction.    There are certain things, however, about which he testifies with absolute confidence.   He swears that the instrument in dispute is all in his own handwriting, save for the dates and signatures;  he swears also (as has been before remarked) that he saw the decedent authenticate either by signature or initials each of the separate pieces of paper of which that instrument is composed; and he swears besides that, in the presence of himself and Mr. Strahan, Mr. Yates published this very document as his last will and testament, and requested their services as attesting witnesses.

Now, assuming that Mr. Waterbury's testimony is true, and I see no reason to distrust it, what light does it shed upon the question whether the decedent, at the time he executed this instrument, was acquainted with its contents?   In the absence of positive proof of such knowledge, probate has sometimes been refused to papers of a testamentary character, although duly signed, published, attested, and in all other respects executed in strict accordance with every requirement of the law relating to wills.   Special precautions are necessary when the maker of an alleged will has suffered from grave personal infirmities, when, for example, he is shown to have been blind, or illiterate, or weak and low from bodily suffering, or broken and infirm because of age.

But, on the other hand, if one is in the prime of life, and in the full possession of his bodily and mental faculties—if his preparations for making a will are not hurried, but deliberate—if he is trained in the methods of business and has been accustomed to execute papers involving important concerns of life, then the mere presence of his signature, in its appropriate place upon a tes-

tamentary paper otherwise properly executed, as required by law, raises the presumption that the provisions of that paper are in conformity with his wishes (Durnell v. Corfield, *1 Rob. Ecc.*, *51;* Day v. Day, *2 Green's Ch.* [*N. J.*], *549;* Fulton v. Andrew, *L. R.*, *7 H. L.*, *448;* Lake v. Ranney, *33 Barb.*, *67*).

Now, the case which I have last put is the case of this decedent. And the presumption that he knew the contents of the paper propounded as his will is supplemented by evidence and circumstances of a very positive character, tending to establish the same fact:

1st. By the testimony of Mr. Strahan, to the effect that the disputed paper is precisely that which Mr. Yates approved after repeated alterations, and that it was read aloud to him immediately before its execution. The truth of this statement is confirmed to some extent by the testimony of Mr. Waterbury. He swears to Mr. Strahan's reading aloud, but is unable, for lack of attention, to settle whether what was read was precisely what was written.

2nd. By the testimony of William H. Stiles, who states that, in the fall of 1878, the decedent told him that he had made a new will, and that he had put it in one of the safes of the Safe Deposit company, and that his executors "would find it there if it was wanted at any time."

3rd. By the evidence that, after the death of Mr. Yates, the paper here in dispute, with other papers belonging to him in his lifetime, were found by Mr. Stiles, Mr. Burns, Mr. Brokaw and Mr. Dissel in a safe rented by Mr. Yates from the Safe Deposit company.

4th. By the fact that, between the time when this paper was executed and the time of the death of Mr.

Yates, nearly two years had elapsed, during all of which interval, so far as the evidence discloses, the paper was in his own possession.   This is a circumstance of the highest importance.    Surely, there is very slight antecedent probability that a person in his senses, who had prepared a will for such a man as Mr. Yates appears to have been, and prepared it at his request and in pretended compliance with his instructions, would not only dare, at the imminent risk of immediate exposure, to insert provisions utterly at variance with those instructions, but would actually deliver the fraudulent instrument into the hands of its signer, to inspect it at his leisure.

The existence of facts so out of the customary range of human experience can only be established, it seems to me, by evidence far more conclusive in its character than any upon which the contestants rely in the present controversy.    Their claim that Mr. Yates was tricked into signing this paper rests chiefly upon three gronnds:

(*a*) Its unusual appearance in the particulars to which reference has already been made.

(*b*) The reduction of the bequest to his children by his first wife much below the sum he had provided for them by the will he executed not many months before, and this, too, without adequate explanation and at a time when he was apparently as kindly disposed to them as ever.

(*c*) The alleged connection of the decedent's attorney with some fraudulent transaction in Scotland about twenty years ago.

As to the first of these grounds, it must appear upon reflection that the general untidiness of the document, so far from justifying an inference favorable to the contest-

ants has a strong tendency in the opposite direction. For I have already declared to be proven, what is conceded by contestant's counsel, as likely to be true, that the paper claimed to be the will is the very paper which Mr. Yates executed in the presence of Messrs. Strahan and Waterbury.

Now, one who claims that this paper is so shabby as to be suspicious upon its face must admit that the decedent himself was put upon his inquiry concerning it, and would have been likely to refrain from executing it till he had given it close scrutiny.

And, regarding the matter in another aspect, it is surely improbable that one, who sought to procure from the decedent his signature to a fraudulent instrument which pretended to be his will, would have presented that instrument in such questionable shape as might well have sufficed of itself to make the scheme abortive.

A similar criticism may justly be made, in respect to the reduction of the bequests to Mrs. Hagan and Mrs. Dickel. By the will executed in the spring of 1878, he left to each of them $10,000, outright, and the interest on an investment of $50,000. By the paper here propounded, each of them is bequeathed the interest on $20,000 only.

If the decedent had given that paper, before he signed it, even the most casual inspection, he could not have failed to discover its radical departure, in this respect, from the directions of his former will. The new provision is not hidden in a corner. It covers all the fourth page, and is written in a large and distinct hand. The words " twenty thousand dollars " appear upon that page five times, and in immediate connection with the names

of his children who are thus fully described: "Cornelia Van Evra Yates, wife of James W. Hagan," and "Lillian M. Yates, wife of Charles Dickel."

It seems absurd to suppose that any person would have attempted to practice upon Mr. Yates so palpable an imposition as this must have been (on the assumption that the change was fraudulent), and it seems equally absurd to suppose that, if such an attempt had been made, it could have succeeded.

As to the evidence tending to show that the decedent's attorney is the person against whom, in the year 1866, a Scotch tribunal pronounced judgment of outlawry upon an accusation of a criminal offense, it is only necessary to say that that fact, if it is assumed to be proven, fails to supply the deficiencies of the contestant's evidence in support of this charge of deceit and imposition.

*Third.* There only remains to be considered the question, whether this paper in truth declares the testamentary wishes of Alonzo C. Yates, or whether it discloses rather the purposes of some other mind by which his was guided and controlled. Upon examining the scanty evidence which either directly or indirectly relates to this branch of the case, it will appear that no influence whatever, either lawful or undue, is shown to have been exercised by the wife of decedent in reference to the preparation and execution of the paper in dispute.

The contestants, so far as this part of their objections is concerned, are compelled to rely almost entirely upon the facts that Mrs. Yates had opportunity to influence her husband, and that his alleged will, while it makes munificent provision in her behalf, is both ungenerous and unjust to the family of his first wife.

Each of these propositions commands my hearty assent. But all of them together will not justify me in entering a decree in favor of these contestants, for all together will not justify a conclusion that the decedent was swayed by the undue influence of any person whomsoever, in the making and execution of the instrument here offered for probate.

The statutes of descent and distribution establish the channels into which the property of an intestate must be diverted after his death. But the disposition which one may make of his estate by a testamentary paper is entirely under his own control, save for some limitations not pertinent to the present contention.

He may be generous or mean at his pleasure, may give none, or give part, or give all to the members of his own family, may use his will for displaying kindly or vindictive sentiments, may indulge, if he choose, his whims, his spite, his vanity, his egotism, his animosities to the top of his bent, and if he is not deficient in mental capacity and is observant of the forms which have been established by law for the execution of testamentary instruments his wishes must be respected by the courts, at least to the extent of adjudging that they be made effectual.

The oft quoted case of Children's Aid Society v. Loveridge (*70 N. Y., 394*) contains a clear statement of what constitutes undue influence within the meaning of the law. "In order," says the court, "to avoid a will upon any such ground, it must be shown that the influence exercised amounted to a moral coercion which restrained independent action and destroyed free agency, or which, by importunity that could not be resisted, constrained the testator to do that which was against his free will and

desire, but which he was unable to refuse or too weak to resist."

So, too, in the later case of Horn v. Pullman (*72 N. Y., 269*), the court says: "The allegation of undue influence has its principal support in the circumstance of the decedent's change of testamentary intention to the prejudice of his children, and the substitution of the grandson and his wife, in their place as residuary legatees. A change of testamentary intention, as bearing upon the allegation of undue influence in procuring a will, is sometimes an important circumstance. But its force depends mainly upon its connection with associated facts. If made upon a reason satisfactory to the testator, although it may seem inadequate to a court investigating the question of undue influence, it furnishes of itself no ground for setting aside the will."

The doctrine of the cases above cited has been since reaffirmed in Coit v. Patchen (*77 N. Y., 533*); and more recently in Marx v. McGlynn (*88 N. Y., 357*). See also, Gardiner v. Gardiner (*34 N. Y., 155*); Seguine v. Seguine (*3 Keyes, 663*); Clapp v. Fullerton (*34 N. Y., 190*); Brick v. Brick (*66 N. Y., 144*).

Tried by the tests which are thus established, the claim of undue influence in the case at bar is discovered to be absolutely without foundation.

The relations between the father and his daughters Cornelia and Lillian for the two years immediately before his death are disclosed to some extent by a series of his letters which forms a part of the evidence. The indications of these letters, however, cannot be implicitly trusted. One of them, at least, is—to use a mild expression in criticising the conduct of the dead—disingenuous.

He writes to Lillian on November 13th, 1878, only a fortnight before the execution of this will, in answer to an appeal for pecuniary assistance:

"Now, my daughter, if I should go on and help you and Nellie [Cornelia] a little every year, what would I do? I would then have to strike both of you out of my will. Now, I have left you both equal to my other children, so after your father's death you will have a large income of your own, without asking your husband for one dollar."

If the decedent ever made any such will, it came into existence and went out without meeting, so far as this evidence discloses, the eye of any person except himself.

In view of the embarrassment arising from exhibitions of what I have styled "disingenuousness," it is difficult to tell whether the decedent's kindly letters to his daughters were or were not the frank and genuine expressions of his affectionate regard. Some of them purport to show intense resentment toward his first wife, and contain bitter attacks upon her character, and threats to disown his daughters if they continue to have aught to do with her. It probably redounds to their credit that they paid little heed to these threats, but I am led to think, from all the evidence, that he carried them in his mind, and remembered to put them into execution. This was a very ignoble reason for cutting down the bequest to his daughters, but, as the Court of Appeals intimates in Horn v. Pullman (*supra*), it must be deemed sufficient for the court, if it was "satisfactory to the testator."

My conclusion, upon the whole case, is that none of the contestants' objections are sustained, and that the paper propounded as the last will and testament of Alonzo C. Yates should be admitted to probate.

A decree may be entered accordingly.