WILLS—UNDUE INFLUENCE—EVIDENCE.
　　Undue influence in the execution of a will giving all testatrix's property, which was worth about $40,000, to her husband, is not shown by evidence that testatrix married her husband two days after being introduced to him by a matrimonial agent; that five months after the marriage she deeded a remainder in all her realty to his son by a former wife; that two months later the will was executed; that the husband frequently quarreled with and maltreated her; and that three months after the execution of the will she committed suicide, after a quarrel with him,—where it appears that testatrix was a large, muscular woman, while the husband was a small man; that she was of vigorous mind, and accustomed to the transaction of business; that she went alone to attorneys who had advised her for years, and gave directions for drawing the will, the husband being present at its execution a week later, but taking no part in the transaction; and that testatrix had no near relatives.

Proceedings for the probate of the will of Lena Brunor, deceased. Granted.

Eugene Cohn, for proponent.
Herman Frank, for contestant.

ABBOTT, S. Lena Brunor died on the 25th day of June, 1895, from the effects of poison self-administered. In early life she married one Herman Falk, with whom she lived happily for 25 years, and by thrift and economy they amassed a snug fortune of some $40,000, all of which, they being childless, was left to the wife, Lena, by the will of the husband, who died in 1893. About one year after the first husband's death, to-wit, on the 1st day of August, 1894, she was intro-

duced by a matrimonial agent to one Martin Brunor, and two days afterwards, on August 3d, she was married to him. On December 31, 1894, she executed deeds which conveyed all her real property to herself for life, with remainder to Emil Brunor, her stepson. On March 23, 1895, she executed a last will and testament, leaving everything to her husband, Martin Brunor, the proponent herein. On June 24, 1895, she had a violent quarrel with her husband, and in the afternoon of that day she took Paris green, from the effects of which she died. Upon the trial all the objections were brushed away except that of undue influence, but that was strenuously insisted upon; and the contestants urgently claim that the results recounted in the foregoing statement of facts could not have been accomplished except by influence that was undue. This array of facts would perhaps seem on first thought to give some color of probability to this contention, but a close analysis of the evidence renders the proposition extremely doubtful.

In the case of Marx v. McGlynn, 88 N. Y. 357, Judge Earl says, at page 370:

"Undue influence may be exercised by physical coercion or by threats of personal harm and duress, by which a person is compelled, really against his will, to make a testamentary disposition of his property. That kind of undue influence can never be presumed. It must be shown by evidence legitimately proving the facts; and, where it is established, the will cannot be admitted to probate, for the reason that it is not the will of the testator. There is another kind of undue influence, more common than that just referred to, and that is where the mind and the will of the testator has been overpowered and subjected to the will of another, so that, while the testator willingly and intelligently executed a will, yet it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Such a will may be procured by working upon the fears or the hopes of a weak-minded person."

We will first discuss the testimony bearing upon the first kind of undue influence described by Judge Earl supra. That the proponent frequently quarreled with and often maltreated his wife is sufficiently established by the evidence produced by the contestants, but I think it also appears that the wife did not tamely submit to his abuses, and was able to, and did, take her own part against him. Her picture, introduced in evidence, portrays her as a large, masculine-looking woman, while the proponent is a small, rather undersized man, and it is my impression that he did not always come off first best in their encounters. I do not think that the evidence legitimately proves the fact that the proponent compelled the making of this will by physical coercion or threats or duress. The existence of this kind of undue influence must be shown affirmatively by him who asserts it (In re Martin, 98 N. Y. 193); and, moreover, the exertion of the influence upon the very act must be proved, and it will not be inferred from opportunity or interest (Seguine v. Seguine, 4 Abb. Dec. 191; Cudney v. Cudney, 68 N. Y. 148). It appears that the testatrix, on the 18th day of March, 1895, a week before the bill in question was executed, went over alone to the offices of the attorneys who had done business for herself and her first husband for years, and who were at this time not well known to the

proponent, and, saying that her relatives had troubled her, gave the instructions for this will, leaving all her property to her husband. On the 23d she went over again, accompanied by her husband, and the paper was executed, but he appears to have taken no part in the proceedings.    I do not find here any affirmative evidence that any undue influence was used by the proponent to compel the testatrix to perform this act.    On the contrary, she seems to have acted entirely independently of him.    From the testimony of the subscribing witnesses, who are lawyers absolutely disinterested, I cannot believe this woman was compelled by brute force, or was in fear of bodily harm, or was under duress of any kind, when she gave the instructions for the will or when it was executed.

The other kind of undue influence defined by Judge Earl supra supposes a testator of weak or impaired mind, and this may sometimes be circumstantially proved.    But no such hypothesis exists in this case.    It is shown beyond peradventure that this woman was no weakling, either mentally or physically.    She was able to take care of her property and transact her business, and to do it well. The cause of the quarrel which drove her to suicide was that her husband refused to whitewash a room in her house, so that she might save the amount necessary to employ a painter.    Much of the testimony adduced by the contestants was given by female witnesses, some of whom were apparently very hostile to the proponent on account of business relations, and others who evidently disliked him on account of his bad treatment of his wife at times, but I do not think it strong enough to substantiate the claim of the contestants.

The testatrix had no children, and the will is contested by a brother living in New York City, and a sister residing in Germany, with neither of whom were her relations particularly close, in which aspect her will need not be considered unnatural.    The "fifth" paragraph of the will sufficiently indicates the feelings of the testatrix towards her cousin Bertha Hirsch, and her reason for not leaving her anything, and comment is unnecessary.    After the will was executed, it was handed to Mrs. Brunor, and was taken home, and placed by her in a little desk in her room, where it was accessible to her at all times down to the very day of her death.    If she had any such permanent hard feelings against her husband as is claimed by the contestants, how easy it would have been for her to have destroyed this instrument at any time after it was executed.    She could have destroyed the will more easily, perhaps, than have taken the poison.

While the record discloses many remarkable and peculiar circumstances, I am not satisfied that the proof of undue influence is sufficiently strong to warrant me in setting aside the will.    Decreed accordingly.